Scott Jeffery MELL, petitioner,
Appellant,

v.

COMMISSIONER OF PUBLIC
SAFETY, Respondent.

No. A07–2372.

Court of Appeals of Minnesota.

Nov. 25, 2008.

Chad P. Nelson, Chad P. Nelson Law Office, LLC, Lindstrom, MN, for appellant.

Lori Swanson, Attorney General, Jeffrey S. Bilcik, Assistant Attorney General, St. Paul, MN, for respondent.

Considered and decided by CONNOLLY, Presiding Judge; LANSING, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

Appellant challenges the decision sustaining his driver's license revocation under the implied-consent law, arguing that (1) there was not probable cause for his arrest for second-degree assault; (2) the arresting officer's invocation of the Minnesota implied-consent law was improper because it was based on an unauthorized preliminary breath test (PBT); and (3) his right to counsel was violated when he had only two minutes to use the telephone and telephone book before the deputy required the test. Because we conclude that the arrest was proper, the administration of the PBT by the county jail during booking was permissible, and appellant's right to counsel was not violated, we affirm.

## FACTS

On February 14, 2007, at approximately 1:12 a.m., Chisago County deputy sheriffs Matt Beckman and Kyle Puelston separately responded to a call from Kevin Swanson, who reported that he was "in a vehicle being rammed on East Rush Lake." Deputy Beckman located Swanson in the middle of the frozen lake, about one-half mile from Flickerbirds Resort. Swanson's vehicle was extensively damaged, and Swanson appeared intoxicated. Swanson explained that appellant Scott Jeffrey Mell, while driving a white Chevrolet pickup with a plow on it (plow truck), had rammed Swanson's vehicle five or six times. Swanson suggested that the attack was motivated by their mutual animosity arising from appellant's marriage to Swanson's former wife.

Deputy Beckman radioed Deputy Puelston that the suspected vehicle was "[a] white Chevy pickup with a plow in front" and was being driven by appellant toward Flickerbirds, which is owned by appellant. Deputy Puelston arrived at the resort, went inside, and met with D.M., appellant's wife. D.M. explained that earlier that evening Swanson drove his vehicle off the frozen lake, into the resort's parking lot, and then back onto the lake. D.M. also stated that she had not seen her husband since dinner. Deputy Puelston then stepped outside Flickerbirds and observed a white Chevy pickup leave the parking lot and drive toward appellant's nearby residential driveway. He could not see if the truck had a snow plow. Deputy Puelston got into his car, caught up with the truck, and pulled into the driveway behind the truck as appellant stepped out of it. Appellant was driving, and no one else was in the truck.

Appellant told Deputy Puelston that he knew nothing of the ramming incident. Although the pickup that appellant was driving did not have a plow or any damage, the deputy saw another pickup through the windows of appellant's garage next to where the men were standing. This truck matched the suspect vehicle's description and had a plow on its front. Deputy Puelston asked appellant if he could look at the vehicle, and appellant said no. When Deputy Beckman arrived, he saw Deputy Puelston talking to appellant and noticed that appellant was argumentative. After a brief conversation, the deputies arrested appellant for second-degree assault. Although Deputy Puelston reported that he detected a faint odor of alcohol on appellant's breath, the deputy did not think that appellant was intoxicated, and neither officer conducted sobriety tests.

Deputy Puelston placed appellant in his car and brought him to the Chisago County jail.[1] Although he again noticed an odor of alcohol on appellant, he did not check for intoxication. At the jail, the jail staff required appellant to submit to a PBT as a part of the routine booking process. Deputy Puelston testified that this PBT is done to determine if an inmate is intoxicated and needs to be isolated from the general jail population. The PBT disclosed that appellant had an alcohol concentration of .146. Deputy Puelston saw the jailer conduct appellant's PBT and its results.

Based on his prior observations and the PBT results, Deputy Puelston decided that appellant had been driving while intoxicated. He read appellant the implied-consent advisory and asked appellant if he wanted to speak with an attorney. Appellant responded, "I don't think I can get a hold of him right now." Twice again the deputy asked appellant whether he wanted to talk to an attorney and received a similar response. At 2:51 a.m., Deputy Puelston made a telephone and telephone directories available to appellant in case he wanted to try to contact a lawyer. Appellant attempted one call to his wife, and, after failing to reach her, he hung up the telephone and walked over to the counter where Deputy Puelston was seated. Deputy Puelston then commented to the effect that appellant did not want to try to reach an attorney. Appellant replied, "Well, I can't get a hold of him. I don't know his number." Deputy Puelston stated, "Alright. We have been through this that you've been made aware that there's a phone book and a phone." Appellant said, "Right." Deputy Puelston asked. "And you don't want to call him at this time?"

Deputy Puelston testified that appellant replied by nodding his head in the affirmative.

Deputy Puelston continued, "The time is 0253 hours. Will you take a breath test at this time?" Appellant replied, "No." When asked why he was refusing to take the test, appellant stated, "I don't know. Do you even have a right to ask me for it?" Deputy Puelston replied, "Well, according to Minnesota state statute, I do." The conversation ended with appellant saying, "That's fine. I don't think you have the right, so I'm like ..." and Deputy Puelston saying, "Alright. We'll be ending this recording at 0254 hours."

Deputy Puelston later testified that he believed that appellant was done attempting to contact an attorney because he did not make any effort to contact counsel beyond trying to call his wife and because he voluntarily hung up the telephone, returned to the counter where Deputy Puelston was positioned, and did not request or protest that he needed more time to contact counsel before making his decision to refuse the test.

Appellant's driver's license was revoked. Appellant subsequently filed a petition seeking judicial review of the revocation. After a hearing, the district court sustained the revocation of appellant's driving privileges. This appeal followed.

## ISSUES

I. Did the deputies have probable cause to arrest appellant for second-degree assault under Minn.Stat. § 609.222, subd. 1 (2006)?

II. Was it improper for the law enforcement officers to use the results of the

1. Subsequent to the arrest, Deputy Beckman was permitted to enter appellant's garage, where he saw that the truck had a plow and indications of recent use, marks, and paint-transfer.

preliminary breath test as a basis for invoking the implied-consent law?

III. Was appellant's right to counsel violated?

## ANALYSIS

### I.

The first issue is whether there was probable cause to arrest appellant for second-degree assault. Appellant argues that probable cause did not exist for two reasons: first, the record does not support the district court's findings of fact and, second, there was not a reasonable basis to conclude that appellant was the individual who assaulted Swanson.

On appeal from a district court's finding that a police officer had probable cause to arrest, this court reviews findings of fact for clear error, giving "due weight to inferences drawn from those facts by [the district court]." *State v. Lee*, 585 N.W.2d 378, 382–83 (Minn.1998) (quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)). Findings are clearly erroneous "only if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) (quotation omitted). This court independently reviews the facts to determine whether, as a matter of constitutional law, probable cause existed to justify the arrest. *State v. Olson*, 436 N.W.2d 92, 94 (Minn.1989), *aff'd*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). This court determines if probable cause existed based on an objective inquiry and review of the totality of the circumstances. *State v. Hussong*, 739 N.W.2d 922, 926 (Minn.App. 2007).

Appellant claims that the district court erred when it found probable cause for his arrest for second-degree assault.

There is probable cause to arrest when, in light of all the circumstances, a prudent person or a person of reasonable caution would believe that a crime has been committed. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Appellant was arrested under Minn.Stat. § 609.222, subd. 1 (2006), which prohibits assault with a dangerous weapon. An assault can be either "[a]n act done with intent to cause fear in another of immediate bodily harm or death" or "[t]he intentional infliction of or attempt to inflict bodily harm upon another." Minn.Stat. § 609.02, subd. 10 (2006).

Appellant claims that the district court's determination of probable cause was in part based on its finding that Deputy Puelston observed a white pickup truck in the garage with an attached snow plow and that this finding was clearly erroneous. Although Deputy Puelston never directly testified about the color of the vehicle that he saw in appellant's garage, Deputy Beckman testified that, before he reached appellant's residence, Deputy Puelston radioed him that he had observed "a white Chevy pickup truck with a plow" in the garage. Thus, through the other deputy's testimony, there was evidence of Deputy Puelston's observation of the color of the pickup in the garage.

The record indicates that, at the time of the arrest, the officers knew that Swanson's vehicle was severely damaged and sitting on the lake. Swanson identified himself, explained that appellant chased him down and rammed into his vehicle five or six times with a white Chevy plow truck, and stated that he actually saw appellant driving the truck. Thus, the victim directly reported to the officer that the criminal conduct occurred.

Appellant also claims that the district court erred by not making a specific finding that Swanson was "drunk" at the time he reported the assault. Although the record indicates that Swanson was apparently intoxicated when he spoke to Deputy Beckman, there is nothing to indicate that Swanson's condition made his report to Deputy Beckman inherently untrustworthy or required additional evidence and findings regarding Swanson's condition and credibility. The officers were told that the truck was last seen headed toward appellant's resort. After a short investigation, Deputy Puelston saw a truck that appeared to match the plow truck's description in appellant's garage. Based on this record, we conclude that the deputies had probable cause to arrest appellant for assault in the second degree.

## II.

The second issue is whether the PBT administered to appellant during booking and Deputy Puelston's use of the results under the implied-consent statute were improper.

### A. Jail's Administration of the PBT

█ Application of a statute to the undisputed facts of a case involves a question of law that is reviewed de novo. *Davies v. W. Publ'g Co.*, 622 N.W.2d 836, 841 (Minn.App.2001), *review denied* (Minn. May 29, 2001). Minnesota has a statute that provides for the use of a PBT by "police officers" who "believe from the manner in that a person is driving, operating, controlling, or acting upon departure from a motor vehicle ... that the driver may be violating or has violated [Minnesota's DWI laws]." Minn.Stat. § 169A.41, subd. 1 (2006). However, this court has found that this statute does not preclude the use of PBTs in other settings. *State v. Laducer*, 676 N.W.2d 693, 696–97 (Minn.

App.2004), *review denied* (Minn. June 15, 2004). In *Laducer*, this court held that "section 169A.41 does not prohibit a correctional facility from testing for intoxication prior to releasing an individual from custody and does not prohibit the results of such a test from being communicated to a peace officer." *Id.* at 697. We further observed that "the result of a breath test administered by [a jailer] may be relied on by a licensed peace officer in forming probable cause to ... invoke the implied consent law." *Id.* at 696. A police officer's reliance on the results of a PBT administered by a jailer is no different from relying on information from a private citizen. *Id.* at 697.

We reject the claim that the administration of the PBT by the jailer was improper simply because it was not done incident to Minn.Stat. § 169A.41. That statute does not limit use of the PBT to traffic stops.

### B. Constitutionality of the Jail's Administration of the PBT

█ We also review whether the jail's administration of the PBT was a violation of the constitutional protection against unreasonable searches. U.S. Const. amend. IV; Minn. Const. art. I, § 10. When the state asks or requires an individual to submit to a PBT, the test is an intrusion—albeit limited—that requires at least some limited constitutional justification. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616–18, 109 S.Ct. 1402, 1412–1414, 103 L.Ed.2d 639 (1989) (concluding that the taking of a blood, urine, or breath sample constitutes a search under the Fourth Amendment); *see also State v. Juncewski*, 308 N.W.2d 316, 321 (Minn. 1981) (requiring justification for requiring a person to submit to a PBT equal to what is required for a *Terry* stop).

█ This court applies a general totality-of-the-circumstances test when re-

viewing the validity of a warrantless, suspicionless search under the state and federal constitutions. *See State v. Bartylla,* 755 N.W.2d 8, 17–18 (Minn.2008) (applying the totality-of-the-circumstances test instead of the "special-need" test to review the warrantless, suspicionless taking of a DNA sample and declining to interpret the state constitution more broadly than the Fourth Amendment in this context). The totality-of-the-circumstances test is carried out by balancing the state's interests against the intrusion into the citizen's personal security. *Id.* at 18. The United States Supreme Court described the test in the following way:

> [U]nder our general Fourth Amendment approach we examin[e] the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests.

*Samson v. California,* 547 U.S. 843, 848, 126 S.Ct. 2193, 2197, 165 L.Ed.2d 250 (2006) (quotation and citation omitted).

The United States Supreme Court has "recognized the validity of suspicionless searches in exempted areas like airports and prison cells; in 'closely regulated' industries, and when the government has a 'special need' that is unrelated to general law enforcement." *Bartylla,* 755 N.W.2d at 15 (citations omitted). More recently, the Court has allowed suspicionless searches of convicts on parole, as long as the searches are "not arbitrary, capricious, or harassing." *See Samson,* 547 U.S. at 848–57, 126 S.Ct. at 2197–2202. In *Bartylla,* the Minnesota Supreme Court found that, considering the totality of the circum-

stances, a warrantless, suspicionless taking of a defendant's DNA as a result of a prior felony burglary conviction for the purpose of placing his DNA profile into a state-mandated crime database did not violate the Fourth Amendment or the Minnesota Constitution. 755 N.W.2d at 17.

Here, we must weigh the Chisago County jail's interests in screening a person being jailed against appellant's privacy interests. According to testimony, Chisago County jail's policies and procedures require administration of a PBT to each inmate during booking. Deputy Puelston explained that the test is administered to protect the safety of inmates and reduce the jail facility's exposure to liability by identifying intoxicated inmates who should be isolated from the general jail population. Protecting the safety of inmates and reducing exposure to liability are clear and legitimate government interests. Appellant does not challenge the policy or its goals.

Although breathing is a life function and a uniquely personal activity, the function is publicly observable. Furthermore, even with efforts to disguise the odor of one's breath, a person cannot prevent others from detecting the qualities of his breath. Although we reasonably expect some privacy in breathing, the scope of that privacy is dependent on the context in which we are located.

Here, appellant's privacy interest is minimal. Collecting a breath sample is clearly an effort to obtain physical evidence from a person, and, like a blood test, it is a search that "implicates ... concerns about bodily integrity." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. at 617, 109 S.Ct. at 1413. However, a breath test is less intrusive than a blood test because a breath test "do[es] not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum

of inconvenience or embarrassment." *Id.* at 625, 109 S.Ct. at 1418. Further, unlike blood and urine tests that can reveal a host of private medical facts about an individual, including whether she is epileptic, pregnant, or diabetic, "breath tests reveal the level of alcohol in the ... bloodstream and nothing more." *Id.* As the Court summarily stated in *Skinner,* "breath tests reveal no other facts in which [an individual] has a substantial privacy interest. In all the circumstances, we cannot conclude that the administration of a breath test implicates significant privacy concerns." *Id.* at 626, 109 S.Ct. at 1418 (citation omitted).

▆▆▆ Further, outside the confines of jail, all that is needed for the police to require submission to a PBT is a specific and articulable suspicion that a suspect is violating DWI laws, which is the level of protection given in the *Terry* pat-down context. *Compare Juncewski,* 308 N.W.2d at 321 *with Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968) (holding that an officer may frisk a person without probable cause if he has reasonable suspicion that the person may be armed). The "overriding function" of the Fourth Amendment's protection against unreasonable searches is to "protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). But this constitutional guarantee does not protect against all intrusions. Rather, it protects only against unreasonable intrusions

or searches "which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768, 86 S.Ct. at 1834.

▆▆▆ Once a suspect is booked, a jailer may conduct a suspicionless search of the suspect and his possessions as part of routine booking. *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) (holding that such a search during booking functions to protect the suspect's property, the police from claims of loss, theft, or vandalism, and the police from danger which could result from failing to search); *State v. Rodewald,* 376 N.W.2d 416, 421 (Minn.1985) (citing concerns similar to those in *Bertine* in holding that police may perform suspicionless examination of possessions of arrestees being jailed, including wallets). Additionally, it has been long held that a person's reasonable expectation of privacy is diminished upon being jailed. *See State v. Cuypers,* 481 N.W.2d 553, 557 (Minn.1992) ("An individual's reasonable expectation of privacy is necessarily restricted ... when the individual asserting that expectation is incarcerated."). State regulations provide that during booking, the jail may search, fingerprint, photograph, and medically screen an arrestee, collect personal data, and seize, inventory, and store an arrestee's personal property. Minn. R. 2911.0200, subp. 7 (2007).[2] If, upon booking, an arrestee's privacy interests drop so low that the federal and state constitutions do not protect his body or possessions from a suspicionless search, his privacy interests

---

**2.** Minn.Stat. § 641.14 (2006) states: "The sheriff of each county is responsible for the operation and condition of the jail.... [T]he sheriff shall maintain strict separation of prisoners to the extent that separation is consistent with prisoners' security, safety, health, and welfare." Every jail facility is required to have a written policy and procedure manual that defines the philosophy and method for

operating and maintaining the facility. Minn. R. 2911.1900 (2007). The manual is required to include a description of the jail's policies related to matters such as: safety and emergency; security and control; and medical and healthcare services; inmate rules and discipline; and admissions, orientation, classification, property control, and release. *Id.*

in his *breath* during the booking process is comparatively lower. He is in a setting where breath is easily and readily detected with minimally intrusive procedures.

We conclude that Chisago County's legitimate interests in operating its jail safely outweighed appellant's claim of privacy, that the administration of the PBT was justified by legitimate government interests in operating the jail, and that the administration of the PBT did not violate either the federal or state constitutions.

### C. Use of Implied–Consent Advisory

Finding the PBT was properly administered, we review de novo whether Officer Puelston's reading the implied-consent advisory to appellant was proper. *Groe v. Comm'r of Pub. Safety*, 615 N.W.2d 837, 840 (Minn.App.2000), *review denied* (Minn. Sept. 13, 2000); *Shane v. Comm'r of Pub. Safety*, 587 N.W.2d 639, 641 (Minn.1998).

Under Minn.Stat. § 169A.20, subd. 1(5) (2006), it is a crime for a person to drive a vehicle "when the person's alcohol concentration at the time, or as measured within two hours of the time, of driving ... the motor vehicle is 0.08 or more." A test may be required when an officer has probable cause to believe that the person violated section 169A.20 and a PBT indicates an alcohol concentration of 0.08 or more. Minn.Stat. § 169A.51, subd. 1(b) (2006). Probable cause exists when the objective facts are such that a person of ordinary care and prudence would entertain an honest and strong suspicion that the crime has been committed by the individual. *Laducer*, 676 N.W.2d at 697.

In this case, Officer Puelston personally detected the odor of alcohol on appellant and observed that appellant had been driving. Later in the evening, he learned that appellant took a PBT and had an alcohol concentration of more than 0.08.

With this information, Officer Puelston had probable cause to believe that appellant was violating Minn.Stat. § 169A.20 and the authority to read appellant the implied-consent advisory.

### III.

The third issue is whether appellant's right to counsel was violated when the deputy required him to decide if he would submit to an Intoxilyzer test. The determination of whether an officer has vindicated a driver's right to counsel is a mixed question of law and fact. *Kuhn v. Comm'r of Pub. Safety*, 488 N.W.2d 838, 840 (Minn.App.1992), *review denied* (Minn. Oct. 20, 1992). This court reviews the district court's findings of fact under a clearly erroneous standard. *Hartung v. Comm'r of Pub. Safety*, 634 N.W.2d 735, 737 (Minn.App.2001), *review denied* (Minn. Dec. 11, 2001). On undisputed facts, this court considers de novo whether a defendant's right to counsel was violated. *Linde v. Comm'r of Pub. Safety*, 586 N.W.2d 807, 809 (Minn.App.1998), *review denied* (Minn. Feb. 18, 1999).

Drivers have a constitutional right, "upon request, to a reasonable opportunity to obtain legal advice before deciding whether to submit to chemical testing." *Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828, 835 (Minn.1991). The right to counsel is limited in DWI cases to ensure that consultation does not unreasonably delay the administration of the test. Minn.Stat. § 169A.51, subd. 2(4) (2006); *Jones v. Comm'r of Pub. Safety*, 660 N.W.2d 472, 475 (Minn.App.2003). The right to counsel is considered vindicated when the driver is provided with a telephone prior to testing and given a reasonable amount of time to contact and consult with an attorney. *Kuhn*, 488 N.W.2d at 841–42.

■ A reasonable time is not a fixed amount of time, and it cannot be based on elapsed minutes alone. *Id.* at 842. When considering the issue, this court must balance the efforts made by the driver against the efforts made by the officer; our focus is "both on the police officer's duties in vindicating the right to counsel and the defendant's diligent exercise of the right." *Id.* This court will consider other factors, including the time of day and length of delay since the driver was arrested, but these are not the exclusive factors that this court may consider. *Gergen v. Comm'r of Pub. Safety,* 548 N.W.2d 307, 310 (Minn.App.1996), *review denied* (Minn. Aug. 6, 1996); *see also Parsons v. Comm'r of Pub. Safety,* 488 N.W.2d 500, 502 (Minn. App.1992) (examining the totality of the circumstances); *Eveslage v. Comm'r of Pub. Safety,* 353 N.W.2d 623, 627 (Minn. App.1984) (holding that driver's limited right to counsel was satisfied when driver could not locate his own attorney and there were no other attorneys he wished to call).

■ Appellant argues that he used the telephone for less than three minutes, this was not a reasonable length of time to contact an attorney and, thus, his right to counsel was not vindicated. Respondent argues that appellant waived his right to counsel and that, even if he did not waive his right, appellant did not make a good-faith and sincere effort to contact an attorney and that Deputy Puelston vindicated appellant's right to counsel.

Here, Deputy Puelston informed appellant that he had a right to contact an attorney and provided him with a telephone and telephone directories to allow him to contact an attorney if he wanted. Appellant had the telephone for less than three minutes. He attempted to contact his wife but not an attorney. He then walked away from the telephone and over to Deputy Puelston. When Deputy Puelston asked appellant if he wished to contact an attorney, appellant stated that he "couldn't get a hold of him" and did not have the telephone number. Appellant did not request another telephone directory or more time to attempt to contact an attorney. Appellant made no further attempts to contact an attorney and, when asked if he was done trying to reach his attorney, he nodded his head. After three minutes, appellant ended his diligent exercise of his right. Instead, appellant changed the subject-by denying that he was driving and disputing whether Deputy Puelston could force him to take the test.

We recognize that appellant's arrest and his implied-consent decision were made late at night and that Deputy Puelston decided that he had vindicated appellant's right to counsel after only a few minutes. Nonetheless, based on the totality of the circumstances, we conclude the record adequately supports the district court's finding that Deputy Puelston vindicated appellant's right to counsel by providing a telephone, directory, and time to make contact with an attorney and the finding that appellant ended any good-faith effort to contact an attorney by the time he was asked whether he would take the test. Consequently, we conclude that appellant's right to counsel was not violated.

## DECISION

Because we find that the arrest was proper, the administration of the PBT by the county jail during booking was proper, and the arresting officer vindicated appellant's right to counsel, we affirm.

**Affirmed.**