*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2069**

Brett Richard Kline, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed August 29, 2016
Affirmed
Bratvold, Judge**

Crow Wing County District Court
File No. 18-CV-15-2535

Richard Kenly, Kenly Law Office, Backus, Minnesota (pro se appellant)

Lori Swanson, Attorney General, Dominic J. Haik, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Bratvold, Presiding Judge; Schellhas, Judge; and Reyes, Judge.

## UNPUBLISHED OPINION

**BRATVOLD**, Judge

Appellant Brett Richard Kline challenges the district court's denial of his petition to rescind the revocation of his driver's license. He argues that the arresting officer did not possess the requisite reasonable, articulable suspicion to conduct an investigatory stop for

impaired driving; the language of the implied-consent advisory misled him in violation of the constitutional right to due process; and his consent to a breath test was coerced. We reject appellant's arguments and affirm.

**FACTS**

This appeal arises from the revocation of Kline's driver's license following his arrest for impaired driving. The relevant factual findings follow.

On May 27, 2015, A.H. called Breezy Point Police to report a suspected impaired-driving complaint involving Kline. A.H. initially gave her address and identified herself as Kline's live-in girlfriend. She then told dispatch that, because Kline was several hours late, she called him at 1:20 a.m. to find out where he was. She stated that Kline told her he was on his way home[1] from Pestello's Bar in Pequot Lakes. Pestello's is approximately eight miles from Kline's Breezy Point residence. A.H. informed dispatch that Kline "sounded drunk" and that he drove a gray Pontiac.

At 1:29 a.m., Officer Joseph Garcia received a call from dispatch regarding A.H.'s complaint and responded by driving "the logical route" between Pestello's and Kline's home. En route, he saw no other cars driving on the road. When he arrived at Kline's address, Garcia saw a man standing in the driveway near a gray Pontiac with the rear driver-side door open. Garcia pulled into the driveway and walked up to the man, said Kline's first name, and Kline responded.

---

[1] The district court's order took care to clarify that A.H. did not report to dispatch that Kline *stated* that he was driving; rather, Kline told her he was "on his way home." The district court noted that "her communication indicated that she perceived from his comments that he was driving."

2

Garcia told Kline that dispatch had received a complaint about Kline's driving. Kline denied driving and told Garcia that "a friend" had dropped him off. Garcia noticed that the car keys were still in the ignition and Kline smelled strongly of alcohol. When Garcia asked Kline how his car arrived home, Kline replied that "two friends" had dropped him off. (The district court interpreted this to mean that one friend drove Kline's car home while another followed in a second car, and once the three arrived, Kline's two friends left in the second car.) By this time, Garcia saw that Kline had bloodshot, watery eyes and slurred speech. During the conversation, A.H. came outside, apparently agitated, and yelled at Kline, "Tell the truth! Stop lying!"

Garcia formed the belief that Kline drove home from the bar based on A.H.'s report to dispatch that Kline sounded drunk and was coming home from a bar, Kline's shifting explanations of how he got home, the absence of other cars on the road, and A.H.'s statement to Kline in the driveway. Garcia then asked Kline to go through field-sobriety tests, and Kline performed poorly on three tests. Garcia next administered a preliminary breath test, which Kline failed. Garcia arrested Kline for driving while impaired and transported him to the Breezy Point police station.

Garcia read Kline the implied-consent advisory in at 2:22 a.m.  After Garcia finished reading the advisory, he asked Kline if he understood and Kline responded "yes." Garcia asked Kline if he wished to contact an attorney, to which Kline replied "no." Garcia asked Kline if he would take a breath test, and Kline responded, "yes." The test showed that Kline's alcohol concentration was greater than 0.08. Garcia reported Kline's test failure to the Commissioner of Public Safety, certifying that probable cause existed to believe Kline

3

had driven a motor vehicle in violation of Minn. Stat. § 169A.20, subd. 1(5) (2014), and Kline's license was subsequently revoked.

In June 2015, Kline petitioned the district court to rescind the revocation. After an implied-consent hearing, the district court sustained the revocation of Kline's license. Kline now appeals.

## DECISION

This court reviews the district court's findings supporting an order sustaining a license revocation for clear error. *Jasper v. Comm'r of Pub. Safety*, 642 N.W.2d 435, 440 (Minn. 2002). "Findings of fact are clearly erroneous if, on the entire evidence, [the reviewing court is] left with the definite and firm conviction that a mistake occurred." *State v. Diede*, 795 N.W.2d 836, 846–47 (Minn. 2011). We give de novo review to questions of law in implied-consent proceedings. *Harrison v. Comm'r of Pub. Safety*, 781 N.W.2d 918, 920 (Minn. App. 2010).

Each of Kline's arguments involve inquiries under the Fourth Amendment, which protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV; *see also* Minn. Const. art. I, § 10 (providing similar protection). A warrantless search or seizure is per se unreasonable unless an exception applies. *Ellingson v. Comm'r of Pub. Safety*, 800 N.W.2d 805, 807 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011). Although license-revocation is civil in nature, this court still applies the exclusionary rule as a remedy

for constitutional violations to implied-consent license-revocation proceedings. *Harrison*, 781 N.W.2d at 920.[2]

## I.      Reasonable, Articulable Suspicion to Conduct an Investigatory Stop

Consistent with the Fourth Amendment, police may conduct a brief, investigatory stop of a motorist without a warrant if the officer has reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). We assess the constitutionality of a traffic stop by considering all relevant circumstances, including the time, the location, and the officer's ability to draw inferences and conclusions based on his training. *Appelgate v. Comm'r of Pub. Safety*, 402 N.W.2d 106, 108 (Minn. 1987). While the reasonable-suspicion standard is "not high," "[p]olice must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity," *Timberlake*, 744 N.W.2d at 393 (quotations omitted).

The reasonable-suspicion standard may be met by information supplied by a reliable informant. *Id.*; *Marben v. State*, 294 N.W.2d 697, 699 (Minn. 1980). Whether an informant's tip can establish reasonable suspicion relies on the circumstances of the particular case, including the informant's credibility and veracity. *State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999). When an informant gives sufficient detail allowing police

---

[2]  Failure to vindicate certain fundamental, constitutional rights in the course of an impaired-driving arrest, for example, has warranted rescission of the resulting license revocation. *See, e.g.*, *Davis v. Comm'r of Pub. Safety*, 509 N.W.2d 380, 386 (Minn. App. 1993), *aff'd*, 517 N.W.2d 901 (Minn. 1994) (affirming district court's rescission of license revocation where appellant's right to counsel was not vindicated).

to locate her and hold her accountable if her information proves false, the officer can assume, for the purpose of making a limited investigatory stop, that the informant is telling the truth. *City of Minnetonka v. Shepherd*, 420 N.W.2d 887, 890 (Minn. 1988).

Kline argues that Garcia seized him before forming an adequate basis for the investigatory stop. Thus, we evaluate the information known to Garcia before he spoke to Kline. *See In re Welfare of E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993) ("Since E.D.J. abandoned the cocaine *after* he was unlawfully directed to stop, the abandonment was the suppressible fruit of the illegality."). Kline implicitly asserts that, because Garcia did not see him driving his car, Garcia could not have reasonably suspected that Kline drove. Certainty is not required to establish reasonable suspicion. *See State v. Haataja*, 611 N.W.2d 353, 354 (Minn. App. 2000), *review denied* (Minn. July 25, 2000) ("The factual basis required to support a stop is minimal . . . .").

Here, A.H. personally spoke to Kline before she reported to police that he "sounded drunk." This occurred at 1:20 a.m., when, as Garcia testified, there is a high incidence of impaired driving. Also, A.H. identified herself to dispatch as Kline's live-in girlfriend, which suggested that she knew him well and increased the reliability of her assessment that he was impaired. Further, A.H. described Kline's car, named the specific bar he had recently left, and informed dispatch that he was en route to their shared home.

Under similar circumstances, the Minnesota Supreme Court has held that an officer's independent corroboration of details contained in an informant's tip supports the officer's reasonable suspicion. *Munson*, 594 N.W.2d at 136. As Garcia approached Kline's residence, he saw no other cars driving. When Garcia arrived, he confirmed several details

6

of A.H.'s tip, including the make and color of the car and that it had arrived at their home. Kline responded to his name, was standing next to the car with the rear driver's-side door open, and the keys were in the ignition.

Based on A.H.'s tip and Garcia's corroboration of the details she reported, we conclude that the reasonable-suspicion standard was met.

## II.     Due-Process Challenge to Implied-Consent Advisory

Kline additionally argues that the language of the implied-consent advisory misled him to believe he had no right to refuse a breath test, in violation of his due-process rights. He claims that the advisory's language emphasizing that state law requires a driver to undergo testing to determine if the driver is under the influence of alcohol "makes it unequivocally clear to the listener that there is no right to refuse under Minnesota law." *See* Minn. Stat. § 169A.51, subd. 2(a) (2014) (providing that, at the time a chemical test is requested, "the person must be informed . . . that Minnesota law requires the person to take a test"). "Whether an implied-consent advisory violates a driver's due-process rights is a question of law, which this court reviews de novo." *Magnuson v. Comm'r of Pub. Safety*, 703 N.W.2d 557, 561 (Minn. App. 2005).

"[D]ue process does not permit the government to mislead individuals as to either their legal obligations or the penalties they might face should they fail to satisfy those obligations." *State v. Melde*, 725 N.W.2d 99, 103 (Minn. 2006). Moreover, the supreme court has recognized the legislature's intention to "give those who drive on Minnesota roads a right to refuse the chemical test." *State v. Brooks*, 838 N.W.2d 563, 571 (Minn.

7

2013) (citing Minn. Stat. § 169A.52, subd. 1 (2012), which provides that "[i]f a person refuses to permit a test, then a test must not be given").

An implied-consent advisory must inform a person "that Minnesota law requires the person to take a test . . . to determine if the person is under the influence of alcohol." Minn. Stat. § 169A.51, subd. 2 (a)(1)(i) (2014). Indeed, Minnesota law requires this of drivers, consistent with the Fourth Amendment. *See id.*, subd. 1(6) (2014) (providing that chemical testing "may be required of a person" under specified circumstances, including lawful arrest for DWI); *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2184 (2016) (concluding that Minnesota law constitutionally criminalizes a driver's refusal to submit to warrantless breath test where driver was arrested for DWI and did not challenge lawfulness of arrest). A driver may choose to refuse chemical testing and therefore violate the law, Minn. Stat. § 169A.52, subd. 1 (2014), thereby subjecting himself to the consequences of violation. Minn. Stat. §§ 169A.20, subd. 2, .52, subd. 3 (2014).

The implied-consent advisory "makes clear that drivers have a choice whether to submit to testing." *Brooks*, 838 N.W.2d at 570. While the advisory informs a person that the law requires him to take a chemical test, the advisory also informs the person "that refusal to take a test is a crime" and "that the person has the right to consult with an attorney." Minn. Stat. § 169A.51, subd. 2. In other words, taken as a whole, the advisory informs a driver that, with the assistance of counsel, he must decide whether to comply with the legal requirement of chemical testing with the information that refusal is itself a crime. *Id.* We therefore conclude that the advisory language does not amount to a due-process violation as applied to Kline. *Cf. Birchfield*, 136 S. Ct. at 2186 (stating that driver

8

"had no right to refuse" warrantless breath test offered after driver's DWI arrest, the legality of which was uncontested, and receipt of Minnesota's implied-consent advisory).

## III. Validity of Consent to Breath Test

Kline next argues that he did not freely and voluntarily consent to a breath test because the surrounding circumstances coerced him into consenting to the test. The district court found that, under the totality of the circumstances, Kline's consent was voluntary.

A breath test is considered a search for Fourth Amendment purposes. *Mell v. Comm'r of Pub. Safety*, 757 N.W.2d 702, 709 (Minn. App. 2008). A warrant to conduct a search is not required "if the subject of the search consents." *Brooks*, 838 N.W.2d at 568. Consent must be made freely and voluntarily. *Id.* Whether an individual's consent was given freely and voluntarily "or was the product of duress or coercion, express or implied," is a question of fact, and a district court's finding of voluntary consent is reviewed for clear error. *Diede*, 795 N.W.2d at 846 (quotation omitted); *accord Poeschel v. Comm'r of Pub. Safety*, 871 N.W.2d 39, 45–46 (Minn. App. 2015).

"Consent must be received, not extracted," and "it is at the point when an encounter becomes coercive . . . that the Fourth Amendment intervenes." *State v. Harris*, 590 N.W.2d 90, 102 (Minn. 1999) (quotation omitted). "[A] driver's decision to agree to take a test is not coerced simply because Minnesota has attached the penalty of making it a crime to refuse the test." *Brooks*, 838 N.W.2d at 570. Instead, the voluntariness of a driver's consent to chemical testing is assessed under "the totality of the circumstances, including the nature of the encounter, the kind of person the d[river] is, and what was said and how it was said." *Id.* at 569 (quotation omitted); *see also Birchfield*, 136 S. Ct. at 2186 (stating that

9

voluntariness of consent to search must be determined from "the totality of all the circumstances") (quotation omitted)). Consent can be voluntary even if the circumstances are uncomfortable for the person being questioned. *Diede*, 795 N.W.2d at 846. Consent to testing is voluntary unless the totality of the circumstances demonstrates that the driver's will was overborne and his capacity for self-determination was critically impaired. *Brooks*, 838 N.W.2d at 571; *accord Poeschel*, 871 N.W.2d at 46.

In *Brooks*, the supreme court analyzed the totality of the circumstances and concluded that Brooks voluntarily consented to chemical testing. 838 N.W.2d at 572. Although it recognized that Brooks consented while in custody after his arrest, the court reasoned that "Brooks was neither confronted with repeated police questioning nor was he asked to consent after having spent days in custody," he "consulted with counsel before agreeing to take each test," and police made clear to him that he had a choice of whether to submit to testing by reading him the implied-consent advisory. *Id.* at 571–72.

Similarly here, Garcia read Kline the implied-consent advisory before asking him whether he would consent to a breath test. Kline consented while in custody after his arrest. Before giving his consent, Kline was not subjected to repeated questioning, nor did he spend days in custody. The record reflects that Kline was not handcuffed at the time. Garcia testified that he read Kline the relevant parts of the advisory word for word, in a "normal[,] conversational voice," and never raised his voice, yelled, or threatened Kline. Garcia then asked Kline if he understood, and Kline responded "yes." Garcia offered Kline the opportunity to consult with an attorney before asking Kline to consent to a test.

Attempting to distinguish *Brooks*, Kline asserts that, unlike Brooks, he did not speak with an attorney before consenting to a breath test. *Brooks*, however, does not hold that voluntariness hinges on *actual* consultation with an attorney. To the contrary, the supreme court reiterated that "the *ability* to consult with counsel about an issue supports the conclusion that a [person] made a voluntary decision." *Id.* at 572 (emphasis added). Although Brooks consulted with counsel before agreeing to take each breath test, this fact merely "reinforce[d] the conclusion that his consent was not illegally coerced." *Id.* at 571.

Here, despite being given the opportunity to consult with counsel, Kline declined. The record does not indicate that Garcia impeded Kline's access to counsel, nor does Kline argue as much. Therefore, Kline was afforded the ability to consult with an attorney even though no consultation occurred. Like *Brooks*, the totality of the circumstances here indicates that Kline's consent to a breath test was free and voluntary. Because the district court's voluntariness finding is not clearly erroneous, we conclude that Kline's consent justified the warrantless search of his breath.

Finally, Kline asserts that *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), *aff'd sub nom. Birchfield*, 136 S. Ct. 2160, was wrongly decided, apparently in anticipation of our reliance on *Bernard*. This challenge fails, first because Kline's voluntary consent to the breath test made the warrantless search permissible under the Fourth Amendment, obviating any discussion of the search-incident-to-arrest exception invoked by *Bernard*. *See United States v. Webster*, 625 F.3d 439, 445 (8th Cir. 2010) ("Warrantless searches need only be justified by one exception to the Fourth Amendment warrant requirement . . . ."). Moreover, the Supreme Court of the United States recently affirmed *Bernard*, holding

that "the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving." *Birchfield*, 136 S. Ct. at 2165, 2184. We therefore reject Kline's challenge based on *Bernard.*

**Affirmed.**