STATE of Minnesota, Respondent,

v.

Wesley Eugene BROOKS, Appellant.

Nos. A11–1042, A11–1043.

Supreme Court of Minnesota.

Oct. 23, 2013.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and Patrick J. Ciliberto, Scott County Attorney, Todd P. Zettler, Assistant County Attorney, Shakopee, Minnesota, for respondent.

Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, Minnesota; and Jeffrey S. Sheridan, Strandemo, Sheridan & Dulas, P.A., Eagan, Minnesota; and Eric McCloud, McCloud Law Firm, PLLC, Saint Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Stephen D. Melchionne, Assistant Attorney General, Saint

Paul, Minnesota, for amicus curiae State of Minnesota.

## OPINION

GILDEA, Chief Justice.

The question presented in this case is whether the police violated the Fourth Amendment rights of appellant Wesley Eugene Brooks when they took blood and urine samples from him without a search warrant. Because we conclude that Brooks consented to the searches at issue, and thus that a warrant was unnecessary, we affirm.

This case arises out of three separate driving incidents that took place during a 6–month period from July 31, 2009, to January 25, 2010. The first incident happened in Scott County on July 31, 2009. At 2:06 a.m., a Shakopee police officer stopped a white SUV driving quickly away from a bar. The driver, Wesley Eugene Brooks, smelled of alcohol. After the officer had Brooks get out of his car, Brooks refused to perform field sobriety tests until he could talk to his attorney, who was a passenger in the SUV. After the attorney told Brooks not to perform any field sobriety tests, the officer brought Brooks to the St. Francis Medical Center.

Once they arrived, the officer started to read to Brooks the Minnesota implied consent advisory. That advisory informs drivers that Minnesota law requires them to take a chemical test for the presence of alcohol, that refusing to take a test is a crime, and that drivers have the right to talk to a lawyer before deciding whether to take a test, "but that this right is limited to the extent that it cannot unreasonably delay administration of the test." Minn. Stat. § 169A.51, subd. 2 (2012).

At first, Brooks refused to listen. The officer then brought Brooks to a telephone. Brooks asked the officer to read the advi-sory again, while his attorney listened over the phone. Brooks then agreed to provide a urine sample. The alcohol concentration in his urine was .14, above the legal limit of .08. See Minn.Stat. § 169A.20, subd. 1(5) (2012). Police did not attempt to secure a search warrant in connection with the July 31, 2009 incident.

The second incident took place in Hennepin County on January 16, 2010. At 7:03 p.m., a Minnesota state trooper was on duty in Minneapolis when Brooks passed her in a pick-up truck on Interstate 35. The trooper saw sparks flying underneath the truck and pulled Brooks over. Brooks appeared to be under the influence so the trooper put Brooks in the back of her squad car while she completed some administrative duties. She then brought Brooks to the Hennepin County Medical Center, where she read him the implied consent advisory.

The trooper gave Brooks access to a phone and phone books, and Brooks called his attorney. Brooks then agreed to take a urine test, but when two Minneapolis police officers accompanied Brooks to the bathroom, he could not urinate. The officers asked Brooks if he would be willing to take a blood test instead. Brooks called his attorney again, and then agreed to take a blood test. The alcohol concentration in Brooks's blood sample was .16. Police did not attempt to secure a search warrant in connection with the January 16, 2010 incident.

The third incident took place in Scott County on January 25, 2010. At 7:11 a.m., Prior Lake police responded to reports of a "slumper" who had been driving erratically but was now sleeping behind the wheel of his car. Police found Brooks's car on the road between two middle schools. Brooks was unconscious in the driver's seat. The car was running and in gear, and Brooks had his foot on the

brake. Police noticed that Brooks's breath smelled of alcohol, and his eyes were bloodshot and watery. His balance was unsteady, and two officers had to help him walk. Brooks did not answer police questions about performing field sobriety tests. As officers tried to talk to Brooks, he repeatedly talked over them and asked if the police had seen him driving.

Police eventually arrested Brooks, and brought him to the Prior Lake Police Department. As an officer tried to read Brooks the implied consent advisory, Brooks refused to sit in a chair and listen. Brooks became agitated and asked for his attorney. Because Brooks was agitated, the officer put Brooks back in the squad car and brought him to the Scott County Jail. Once they arrived, the officer again started reading the implied consent advisory to Brooks, who stood against the wall and refused to sit. While the officer read the advisory, Brooks talked over him and asked for his attorney. The officer gave Brooks a phone, and Brooks insisted that he speak with his attorney on speakerphone.

During the conversation between Brooks and his attorney, Brooks became agitated again and tried to tip over a table with his hands. Because of Brooks's agitation, the officer ended the phone call 5 minutes after it had started. When the officer asked Brooks if he would take a urine test,

Brooks responded, "I'll piss in a cup." The alcohol concentration in Brooks's urine sample was .16. Police did not attempt to secure a search warrant in connection with the January 25, 2010 incident.

In each of the three separate incidents, the State of Minnesota charged Brooks with two counts of first-degree driving while impaired, Minn.Stat. §§ 169A.20, subd. 1(1), 169A.24 (2012), and Minn.Stat. §§ 169A.20, subd. 1(5), 169A.24.[1] Brooks moved to suppress the results of the blood and urine tests in each of the three cases because police took the samples without a warrant. The two Scott County cases were heard together, and the district court denied Brooks's request to suppress the two urine tests, concluding that the evanescent quality of alcohol in the body created exigent circumstances that excused police from seeking a warrant. In the Hennepin County case, the district court denied Brooks's request to suppress the blood test results. The court concluded that Brooks consented to the chemical test at the hospital.

After the district courts denied the motions to suppress, the cases proceeded to trial on stipulated facts. The district courts convicted Brooks in all three cases of first-degree driving while impaired, in violation of Minn.Stat. §§ 169A.20, subd. 1(5), 169A.24. In Scott County, the district court sentenced Brooks to two prison

1. After the Shakopee incident, Brooks was also charged with driving after his license had been cancelled, Minn.Stat. § 171.24, subd. 5 (2012), possession of drug paraphernalia, Minn.Stat. § 152.092 (2012), possession of marijuana in a motor vehicle, Minn.Stat. § 152.027, subd. 3 (2012), and not having a driver's license in his possession, Minn.Stat. § 171.08 (2012). After the Prior Lake incident, Brooks was also charged with fourth-degree assault of a peace officer, Minn.Stat. § 609.2231, subd. 1 (2012), because he flicked urine on an officer during his urine test. He was also charged with driving after his license had been cancelled, Minn.Stat. § 171.24, subd. 5, possession of marijuana in a motor vehicle, Minn.Stat. § 152.027, subd. 3, fifth-degree possession of a controlled substance, Minn.Stat. § 152.025, subd. 2(b)(1) (2012), and having an open bottle in his car, Minn.Stat. § 169A.35, subd. 3 (2012). Other than the fourth-degree assault to which Brooks pleaded guilty, the State dismissed all of these charges in exchange for Brooks's agreement to proceed to a stipulated facts trial on one count of first-degree driving while impaired, Minn.Stat. §§ 169A.20, subd. 1(5), 169A.24.

terms of 72 months, to be served concurrently. In Hennepin County, the district court sentenced him to a prison term of 48 months.

The Minnesota Court of Appeals affirmed Brooks's convictions in two separate opinions. *State v. Brooks (Brooks I),* No. A11–1042, 2012 WL 1570064, at *3 (Minn.App. May 7, 2012), *rev. denied* (Minn. July 17, 2012), *vacated by Brooks v. Minnesota,* —— U.S. ——, 133 S.Ct. 1996, —— L.Ed.2d —— (2013); *State v. Brooks (Brooks II),* No. A11–1043, 2012 WL 1914073, at *2 (Minn.App. May 29, 2012), *rev. denied* (Minn. July 17, 2012), *vacated by Brooks,* —— U.S. ——, 133 S.Ct. 1996. In both cases, the court of appeals relied on our precedent holding that the evanescent quality of alcohol in the body created a single-factor exigent circumstance that on its own allowed police to search drivers suspected of driving under the influence without a warrant. *Brooks I,* 2012 WL 1570064, at *2–3 (citing *State v. Netland,* 762 N.W.2d 202, 212–14 (Minn.2009), *abrogated in part by Missouri v. McNeely,* —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013) and *State v. Shriner,* 751 N.W.2d 538, 545 (Minn.2008), *abrogated by McNeely,* —— U.S. ——, 133 S.Ct. 1552); *Brooks II,* 2012 WL 1914073, at *2 (citing *Netland,* 762 N.W.2d at 211–14).

Brooks sought review in our court in both cases. We consolidated Brooks's appeals but denied his petitions for review. *State v. Brooks,* Nos. A11–1042, A11–1043 Order (Minn. filed July 17, 2012). Brooks then filed a petition for a writ of certiorari to the United States Supreme Court. The Supreme Court granted Brooks's petition for a writ of certiorari, vacated the judgments, and remanded the cases for further consideration in light of *McNeely.* *Brooks,* —— U.S. ——, 133 S.Ct. 1996 (2013).

In *McNeely,* the Supreme Court addressed whether the Fourth Amendment requires police to get a warrant before taking a blood sample from a driver suspected of being under the influence who did not consent to the search. —— U.S. at ——, 133 S.Ct. at 1556. The Court held that the fact that the alcohol was dissipating in McNeely's blood did not, by itself, establish that there were "exigent circumstances" sufficient to excuse police from seeking a warrant. *Id.* Instead, the Court recognized that exigent circumstances, based in part on the rapid dissipation of alcohol in a suspect's body, may allow police to obtain a blood sample without a warrant but that courts must determine whether exigency exists on a case-by-case basis and consider the totality of the circumstances. *Id.*

Following remand from the Supreme Court, the court of appeals reinstated Brooks's appeals. We granted the State's petitions for accelerated review. *State v. Brooks,* Nos. A11–1042, A11–1043, Order (Minn. filed July 16, 2013).

■ Brooks argues that under *McNeely,* the warrantless searches of his blood and urine cannot be upheld solely because of the exigency created by the dissipation of alcohol in the body. We agree. *See McNeely,* —— U.S. at ——, 133 S.Ct. at 1561. The State, however, urges us to uphold the warrantless searches on several separate grounds, asserting that Brooks consented to the searches, exigent circumstances existed in Brooks's cases, the searches were valid incident to Brooks's lawful arrests, and the searches were independently "reasonable" as minimal intrusions into Brooks's privacy. We turn first to the question of consent.

## I.

The Hennepin County District Court found that Brooks consented to both a urine test and a blood test in the Minne-

apolis case, noting that nothing in the record suggested "in any way" that police misled Brooks "with respect to his obligation to undergo blood alcohol content testing or the penalties he might face should he fail to satisfy those obligations." The court found nothing in the record to suggest that Brooks "was coerced in the sense that his will had been overborne and his capacity for self-determination critically impaired." The court also found nothing suggesting that Brooks, "after twice talking with his attorney," was consenting to the tests "because he was being forced to do so or that his consent to the blood test was not a knowing and voluntary consent on the part of the Defendant." [2]

The State urges us to uphold the Hennepin County District Court decision and conclude that a warrant was not required for any of the three searches based on Brooks's consent. Brooks argues that he did not consent because he agreed to submit to chemical testing only after the police told him that refusal to submit to the testing was a crime. He also argues that any consent implied from Minnesota's implied consent law is unconstitutional. We agree with the State that Brooks consented to the searches.

### A.

■ The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S. Const. amend. IV. This guarantee establishes the right to privacy "as one of the unique values of our civilization," and "with few exceptions, stays the hands of the police unless they have a search warrant." *McDonald v. United States*, 335 U.S. 451, 453, 69 S.Ct. 191, 93 L.Ed. 153 (1948). Taking blood and urine samples from someone constitutes a "search" under the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616–17, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). But police do not need a warrant if the subject of the search consents. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ For a search to fall under the consent exception, the State must show by a preponderance of the evidence that the defendant freely and voluntarily consented. *State v. Diede*, 795 N.W.2d 836, 846 (Minn.2011). Whether consent is voluntary is determined by examining the "totality of the circumstances." *State v. Harris*, 590 N.W.2d 90, 102 (Minn.1999). Consent to search may be implied by ac-

---

**2.** The State did not argue that Brooks consented in the Scott County cases, and as a result, the Scott County District Court did not determine if Brooks consented. Brooks argues that the State has thus waived the consent issue. But our rules provide that parties on appeal can defend judgments "on any ground that the law and record permit that would not expand the relief that has been granted to the party." Minn. R.Crim. P. 29.04, subd. 6; *see, e.g., State v. Grunig*, 660 N.W.2d 134, 137 (Minn.2003) ("A respondent can raise alternative arguments on appeal in defense of the underlying decision when there are sufficient facts in the record for the appel-

late court to consider the alternative theories, there is legal support for the arguments, and the alternative grounds would not expand the relief previously granted."). Here, where the Supreme Court changed the relevant law on warrantless searches of suspected drunk drivers while Brooks's appeals were pending, it is in the interests of justice to consider Scott County's alternative argument for upholding the warrantless searches. And the record is sufficiently developed for us to consider the issue of consent in the Scott County cases because the facts on which we rely to conclude that Brooks consented, as discussed below, are facts to which the parties stipulated.

tion, rather than words. *Diede*, 795 N.W.2d at 848. And consent can be voluntary even if the circumstances of the encounter are uncomfortable for the person being questioned. *Id.* at 846. An individual does not consent, however, simply by acquiescing to a claim of lawful authority. *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Because police conducted the searches at issue in this case under Minnesota's implied consent law, our totality of the circumstances analysis begins with a discussion of that statutory scheme. Minnesota's implied consent law establishes that anyone who drives a motor vehicle in the state consents "to a chemical test of that person's blood, breath, or urine for the purpose of determining the presence of alcohol" when certain conditions are met. Minn.Stat. § A.51, subd. 1(a) (2012). As relevant here, police can require someone to take a test when an officer has probable cause to believe the person committed the offense of driving while impaired and the person has been lawfully arrested for driving while impaired. *Id.*, subd. 1(b) (2012).

The implied consent law also requires that police tell drivers that "Minnesota law requires [them] to take a test" to determine if they are "under the influence of alcohol," that "refusal to take a test is a crime," and that they have a right to talk to an attorney, "but that this right is limited to the extent that it cannot unreason-

ably delay administration of the test." Minn.Stat. § 169A.51, subd. 2. It is a crime for a person to refuse to take a test requested under the implied consent law. Minn.Stat. § 169A.20, subd. 2 (2012). But if someone suspected of driving while impaired does not agree to take a test, the police may not administer one.[3] Minn. Stat. § 169A.52, subd. 1 (2012).

The parties do not dispute that the police complied with all statutory requirements in each of the three incidents at issue here. The parties also do not dispute that Brooks consented as a factual matter to the three searches. Our analysis likewise confirms that Brooks consented. As noted above, whether Brooks consented is assessed by examining all of the relevant circumstances. This analysis requires that we consider the totality of the circumstances, "including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said." *State v. Dezso*, 512 N.W.2d 877, 880 (Minn.1994).[4]

Here, the nature of the encounter includes how the police came to suspect Brooks was driving under the influence, their request that he take the chemical tests, which included whether they read him the implied consent advisory, and whether he had the right to consult with an attorney. Brooks does not argue that police did not have probable cause to believe that he had been driving under the

3. When police have probable cause to believe someone has violated the criminal vehicular homicide and injury laws, they may require a test "despite the person's refusal." Minn. Stat. § 169A.52, subd. 1 (2012). This provision is not at issue in this case.

4. The State directs us to the fact that Minnesota law, Minn.Stat. § .51, subd. 1(a), implies Brooks's consent from his voluntary choice to drive on Minnesota's roads. We have said that operating a motor vehicle upon the pub-

lic highways "is in the nature of a license or privilege," and that the enjoyment of that privilege "depends upon compliance with conditions prescribed by law." *Anderson v. Comm'r of Highways*, 267 Minn. 308, 317, 126 N.W.2d 778, 784 (1964). Because the record demonstrates that Brooks consented to the three searches even without the consent implied by Minn.Stat. § 169A.51, subd. 1(a), we do not rely on the statutorily implied consent.

influence. He also does not contend that police did not follow the proper procedures established under the implied consent law. Police read Brooks the implied consent advisory before asking him whether he would take all three tests, which makes clear that drivers have a choice of whether to submit to testing. In all three cases, police gave Brooks access to telephones to contact his attorney and he spoke to a lawyer. In fact, in one case, he even had two separate phone calls with an attorney. After consulting with his attorney, Brooks agreed to take the tests in all three instances.

Brooks nevertheless argues that his "consent" was coerced and therefore invalid. Specifically, Brooks argues that he did not truly have a choice of whether to submit to the tests because police told him that if he did not do so, he would be committing a crime, and he contends that the fact that police advised him that it is a crime to refuse the chemical tests renders any consent illegally coerced. We disagree.

The Supreme Court and our court have addressed the issue of coercion within the context of implied consent statutes. In *South Dakota v. Neville,* 459 U.S. 553, 564, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the Supreme Court held that a driver is not coerced into testifying against himself in violation of the Fifth Amendment when the State introduces his refusal to submit to chemical tests into evidence in a criminal trial for driving under the influence. The Court concluded that "the State did not

directly compel respondent to refuse the test, for it gave him the choice of submitting to the test or refusing." *Id.* at 562, 103 S.Ct. at 922. While the "choice to submit or refuse to take" the test may be a "difficult" one, the Court held that the decision was "not an act coerced by the officer." *Id.* at 564, 103 S.Ct. at 923. We followed the analysis in *Neville* when we held that Minnesota's implied consent law, even though it makes it a crime to refuse testing, also does not coerce a driver into testifying against himself. *McDonnell v. Comm'r of Pub. Safety,* 473 N.W.2d 848, 855–56 (Minn.1991).

█ *Neville* and *McDonnell* examine the issue of coercion within the context of the Fifth Amendment privilege against self-incrimination. But the question in both cases was whether the existence of a consequence for refusing to take a chemical test rendered the driver's choice involuntary. *See Neville,* 459 U.S. at 562–63, 103 S.Ct. 916; *McDonnell,* 473 N.W.2d at 855–56. We address the same question in the context presented here when we examine whether Brooks's consent was voluntary, as the State argues, or whether it was coerced, as Brooks argues. *See Harris,* 590 N.W.2d at 102 (Minn.1999) (explaining that consent to search becomes involuntary when the encounter with police becomes "coercive"). Based on the analysis in *Neville* and *McDonnell,* a driver's decision to agree to take a test is not coerced simply because Minnesota has attached the penalty of making it a crime to refuse the test.[5]

---

**5.** The concurrence reaches the opposite conclusion and finds that Brooks's consent was unlawfully coerced under *Prideaux v. State Department of Public Safety.* 310 Minn. 405, 409, 247 N.W.2d 385, 388 (1976). But the concurrence ignores the fact that we concluded in *Prideaux* that drivers have a "choice" as to whether to submit to chemical testing and that when confronted with the "decision about whether to refuse testing," drivers are entitled to consult with counsel provided there is no unreasonable delay. *Id.* at 412, 421, 247 N.W.2d at 390, 394. Unlike the driver in *Prideaux,* Brooks got the benefit of counsel when he was making his choice and deciding whether to submit to testing. *Prideaux* therefore does not support the concur-

But, Brooks argues, the Supreme Court's decision in *Bumper v. North Carolina* requires us to conclude that he did not consent to the searches. 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). We are not persuaded. In *Bumper*, police sought to justify their search of a house based on the owner's consent, contending that she consented to the search by saying "[G]o ahead" after police told her they had a warrant. *Id.* at 546, 88 S.Ct. at 1790.[6] The Court held that this sort of submission to authority did not constitute consent. *Id.* at 548, 88 S.Ct. at 1791–92. The Court concluded that when a police officer claims authority to search a house under a warrant, "he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Id.* at 550, 88 S.Ct. at 1792.

Unlike *Bumper*, the Minnesota Legislature has given those who drive on Minnesota roads a right to refuse the chemical test. *See* Minn.Stat. § .52, subd. 1. If a driver refuses the test, the police are required to honor that refusal and not perform the test. *Id.*[7] Although refusing the test comes with criminal penalties in Minnesota, the Supreme Court has made clear that while the choice to submit or refuse to take a chemical test "will not be an easy or pleasant one for a suspect to make," the criminal process "often re-quires suspects and defendants to make difficult choices." *Neville*, 459 U.S. at 564, 103 S.Ct. 916. *Bumper* therefore does not support Brooks's argument that the State unlawfully coerced his consent.

With respect to the question of coercion, we have been less willing to find that a defendant voluntarily consented to a search after he or she has been arrested because someone in custody "becomes more susceptible to police duress and coercion." *See, e.g., State v. High*, 287 Minn. 24, 27, 176 N.W.2d 637, 639 (1970); *see also United States v. Mitchell*, 322 U.S. 65, 69, 64 S.Ct. 896, 88 L.Ed. 1140 (1944) ("The mere fact that a confession was made while in the custody of the police does not render it inadmissible."). But the fact that Brooks was under arrest is not dispositive here. Brooks was neither confronted with repeated police questioning nor was he asked to consent after having spent days in custody. *See High*, 287 Minn. at 27–28, 176 N.W.2d at 639. As the Hennepin County District Court noted, nothing in the record suggests that Brooks "was coerced in the sense that his will had been overborne and his capacity for self-determination critically impaired."

The fact that Brooks consulted with counsel before agreeing to take each test reinforces the conclusion that his consent was not illegally coerced. In this context, "[a]n attorney functions as an objective advisor who could explain the alternative choices" to the driver. *Friedman v.*

---

rence's conclusion that Brooks's consent was unlawfully coerced.

**6.** In *Bumper*, police did have a warrant to search the house. *See Bumper*, 391 U.S. at 550 n. 15, 88 S.Ct. 1788. From the beginning of the case, however, prosecutors did not rely on the warrant to justify the search: instead, they relied upon consent. *See id.* at 546, 88 S.Ct. at 1790–91. The Court noted that "no warrant was ever returned, and there is no way of knowing the conditions under which it

was issued, or determining whether it was based upon probable cause." *Id.* at 550 n. 15, 88 S.Ct. at 1792.

**7.** This case is therefore materially different from *McNeely* on the issue of consent. In *McNeely*, the suspect refused to provide a blood sample after police read him the state's implied consent advisory, and police took the sample despite the refusal. *McNeely*, —— U.S. at ——, 133 S.Ct. at 1557.

*Comm'r of Pub. Safety,* 473 N.W.2d 828, 833 (Minn.1991). And we have recognized that the ability to consult with counsel about an issue supports the conclusion that a defendant made a voluntary decision. *See State v. Worthy,* 583 N.W.2d 270, 276 (Minn.1998) (holding that defendants' waiver of their right to counsel was voluntarily made, in part, because they were able to consult with counsel before they made the decision); *State v. Jones,* 266 N.W.2d 706, 712 (Minn.1978) (finding that waiver of right to counsel was voluntary, because court could presume public defender had described "the benefits of legal assistance and the risks of proceeding without it" to defendant); *see also Henderson v. Morgan,* 426 U.S. 637, 647, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976) (finding that a plea was voluntary after defendant spoke with his attorney because it is appropriate to presume that "in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit.").

 In addition, by reading Brooks the implied consent advisory police made clear to him that he had a choice of whether to submit to testing. While an individual does not necessarily need to know he or she has a right to refuse a search for consent to be voluntary, the fact that someone submits to the search after being told that he or she can say no to the search supports a finding of voluntariness. *See Harris,* 590 N.W.2d at 103 (finding that a defendant consented to a search after police told him that "any questioning or searching would be voluntary"); *see also State v. Hanley,* 363 N.W.2d 735, 739 (Minn.1985).

In sum, based on our analysis of the totality of the circumstances, we hold that Brooks voluntarily consented to the searches at issue in this case.

**B.**

 In the alternative to his argument that he did not consent to the searches, Brooks argues that even if he were found to have consented by operation of the implied consent statute, Minn.Stat. § 169A.51, subd. 1(a), that the statute itself is unconstitutional. Specifically, Brooks contends that the Legislature does not have the power to imply someone's consent to waive his or her Fourth Amendment rights as a condition of granting the privilege to drive in Minnesota. Brooks's constitutional argument fails.

As a threshold matter, Brooks's argument is inconsistent with the Supreme Court's discussion of implied consent laws in *McNeely.* As the Supreme Court recognized in *McNeely,* implied consent laws, which "require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood alcohol concentration] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense," are *"legal tools"* states continue to have to enforce their drunk driving laws. —— U.S. at ——, 133 S.Ct. at 1566 (plurality opinion) (emphasis added). The Court noted that these laws typically require suspected drunk drivers to take a test for the presence of alcohol and mandate that a driver's license will be revoked if they refuse a test. *Id.* By using this "legal tool" and revoking a driver's license for refusing a test, a state is doing the exact thing Brooks claims it cannot do—conditioning the privilege of driving on agreeing to a warrantless search.

Even more importantly, however, we do not hold that Brooks consented because Minnesota law provides that anybody who drives in Minnesota "consents ... to a chemical test." *See* Minn.Stat. § 169A.51, subd. 1(a). Rather, we hold that Brooks consented based on our analysis of the

totality of the circumstances of this case. For that reason, *State v. Henning,* 666 N.W.2d 379 (Minn.2003), on which Brooks relies, is inapposite.

In *Henning,* we held that a statute that authorized the police to stop a car with "whiskey plates," which were license plates issued to a person who had their driver's license suspended for alcohol-related offenses, was unconstitutional.[8] *Id.* at 384– 85. Unlike Minnesota's implied consent law, the statute at issue in *Henning* did not address a driver's consent; instead, it gave the police the authority to take certain action. *See* Minn.Stat. § 168.0422 (2012). And, unlike Brooks, the driver did not consent to the search. *Henning,* 666 N.W.2d at 384. We refused to "imply" that the driver consented to the stop "under these facts" simply because the driver was driving a vehicle with the special license plates. *Id.* at 383–84. We do not imply consent in this case either. Rather, as explained above, the totality of the circumstances demonstrate that Brooks explicitly and voluntarily consented to the searches at issue. *Henning* therefore does not support Brooks's constitutional argument.

For the foregoing reasons, we hold that Brooks has not demonstrated that Minnesota's implied consent statute is unconstitutional.[9]

Affirmed.

WRIGHT, J., took no part in the consideration or decision of this case.

STRAS, Justice (concurring).

The court is mistaken when it concludes that Brooks voluntarily consented at the scene to any of the three searches conducted in this case. In each of the three encounters, a police officer read Minnesota's implied-consent advisory, which informed Brooks that refusal to consent to a blood-alcohol test is a crime. Perhaps contemplating this moment, we observed in *Prideaux v. State* that "[t]he obvious and intended effect of the implied-consent law is to *coerce* the driver suspected of driving under the influence into 'consenting' to chemical testing, thereby allowing scientific evidence of his blood-alcohol content to be used against him in a subsequent prosecution for that offense." 310 Minn. 405, 409–10, 247 N.W.2d 385, 388 (1976) (emphasis added). Since *Prideaux,* Minnesota's implied-consent law has become even *more* coercive because it now imposes criminal liability for test refusal.[1] It is

---

8. We found the statute at issue unconstitutional because it eliminated the constitutional requirement that an officer have a reasonable, articulable suspicion of criminal activity before stopping a car. *Henning,* 666 N.W.2d at 385. We are not faced with that issue here because the implied consent statute requires, in relevant part, that police have probable cause to believe a driver is under the influence before a chemical test can be requested and that the driver consent before the test can be administered. Minn.Stat. § 169A.51, subds. 1, 2.

9. Having decided that Brooks consented to the searches, we do not need to address the State's other arguments advocating against suppression of the fruits of the searches.

---

1. *Prideaux* involved an earlier version of the implied-consent law, under which test refusal resulted only in license revocation, not criminal liability. 310 Minn. at 409–10, 247 N.W.2d at 388; Minn.Stat. § .123, subd.(1974), *repealed by* Act of May, 2000, ch., art., § , 2000 Minn. Laws 1484, 1537. I have my doubts about whether license revocation, standing alone, is so coercive that a person threatened with it could not voluntarily consent to a blood, breath, or urine test. But given that we described the *lesser* threat of license revocation in *Prideaux* as intended "to coerce" a driver into "'consenting' to chemical testing," 310 Minn. at 409, 247 N.W.2d at 388, surely the *greater* threat of criminal liability coercively extracts a driver's consent to chemical testing. *See State v. Dezso,* 512 N.W.2d

hard to imagine how Brooks's consent could have been voluntary when he was advised that refusal to consent to a search is a crime. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (stating that consent must be voluntary, not "the product of duress or coercion, express or *implied*" (emphasis added)); *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ("Where there is coercion there cannot be consent.").

I do not mean to suggest that a driver can never voluntarily consent to a blood, breath, or urine test during a traffic stop. Nor do I express any opinion about what effect, if any, we might give to a driver's decision to drive on Minnesota roads in light of the implied-consent law.[2] But in this case, I cannot join the court's opinion because the particular theory of consent advanced by the court cannot withstand constitutional scrutiny. I therefore concur only in the judgment of the court.

I would affirm the decision to admit the blood-alcohol evidence from each of the

searches in this case based on the rule from *Davis v. United States*, —— U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). Under *Davis*, "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* at ——, 131 S.Ct. at 2422. *Davis* builds upon the good-faith exception to the exclusionary rule first articulated in *United States v. Leon*, which held that the Fourth Amendment does not require suppression of "evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate," even if the warrant is later found to be defective. 468 U.S. 897, 913, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

The exclusionary rule, which requires courts to suppress unlawfully seized evidence, is a prudential rule developed by the Supreme Court to compel respect for the Fourth Amendment and to deter Fourth Amendment violations. *Davis*, —— U.S. at ——, 131 S.Ct. at 2426. Although both the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution

---

877, 880 (Minn.1994) ("Consent must be received, not extracted.").

Contrary to the court's assertion, neither *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), nor *McDonnell v. Commissioner of Public Safety*, 473 N.W.2d 848 (Minn.1991), undermines *Prideaux*. Nor does either case support the court's conclusion that Brooks voluntarily consented to any of the three searches. *Neville* held that "no impermissible coercion is involved when [a] suspect *refuses*" to take a blood-alcohol test, even when the legal consequences for his refusal included the loss of his driver's license and use of the test refusal against him in a criminal trial. *Neville*, 459 U.S. at 562, 103 S.Ct. at 921–22 (emphasis added). The issue in *Neville*—whether a suspect's *refusal* to submit to a test was coerced—is the exact opposite of the issue presented in this case and in *Prideaux*— whether a suspect's *submission* to a test was coerced. Similarly, *McDonnell* (following *Ne-*

*ville* ) held that "[t]he fact that certain individuals may face criminal charges for refusing to undergo testing in no way *compels* those individuals to *refuse*." 473 N.W.2d at 855–56 (emphasis added); *see also id.* at 854 (citing *Prideaux* with approval). It is a mystery how the court starts from the premise that the penalties for test refusal in the implied-consent statute do not compel test *refusal*—the holdings of *Neville* and *McDonnell*—to reach the conclusion that the penalties for test refusal in the implied-consent statute do not compel *submission* to testing—the very purpose of the criminal penalties.

2. The plurality opinion in *Missouri v. McNeely* described implied-consent laws as among a "broad range of legal tools" that states can use "to enforce their drunk-driving laws and to secure [blood-alcohol-concentration] evidence without undertaking warrantless nonconsensual blood draws." —— U.S. ——, ——, 133 S.Ct. 1552, 1566, 185 L.Ed.2d 696 (2013) (plurality opinion).

protect the right of citizens to be free of unreasonable searches and seizures, neither mandates that courts suppress evidence obtained in violation of either provision. U.S. Const. amend.IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); Minn. Const. art.I, § 10 ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.").

The prudential nature of the exclusionary rule has led to the development of a prudential exception to it: the good-faith exception. The good-faith exception recognizes that excluding evidence imposes significant costs on society and the criminal-justice system, and that "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, —— U.S. at ——, 131 S.Ct. at 2427. When law-enforcement conduct is highly culpable, the deterrence benefits of exclusion are high; conversely, when law-enforcement conduct is less culpable, the deterrence benefits of exclusion are lower. *Id.* ("The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue." (citation omitted) (internal quotation marks and brackets omitted)).

Although this court has yet to adopt the good-faith exception, *State v. Jackson*, 742 N.W.2d 163, 180 n. 10 (Minn.2007), this is an appropriate case for us to do so.[3] Nothing in the Minnesota Constitution or in our case law undermines *Davis's* reasoning, and the deterrence benefits of excluding the test results from the blood and urine evidence in this case are essentially zero.

Indeed, there is no dispute that the police officers fulfilled the requirements of Minn.Stat. § 169A.51, subd.(2012), when they read the implied-consent advisory to Brooks. The officers also fully complied with *Friedman v. Commissioner of Public Safety*, 473 N.W.2d 828, 837 (Minn.1991), when they gave Brooks an opportunity to consult with an attorney before providing a

**3.** Brooks argues that Minn.Stat. § 626.21 (2012) bars this court from adopting the good-faith exception to the exclusionary rule. Section 626.21 sets forth seven grounds on which a person "aggrieved by an unlawful search and seizure" may move a court "for the return of the property and to suppress the use, as evidence, of anything so obtained." According to Brooks, section 626.21 requires the exclusion of unlawfully seized evidence because the statute also provides, in relevant part, as follows: "If the motion is granted the property shall be restored unless otherwise subject to lawful detention, and it shall not be admissible at any hearing or trial."

Brooks is incorrect for at least two reasons. First, the provision on which Brooks relies relates only to seized "property," and it is undisputed that Brooks is not seeking the return or suppression of his property (i.e., blood and urine samples), but rather the suppression of the result of tests conducted on that property. Second, the disputed provision sets forth a remedy "[i]f [a] motion [to suppress] is granted," but does not provide any substantive guidelines for when a court must grant such a motion. Stated differently, even if a defendant establishes one of the seven grounds on which a motion under section 626.21 may be brought, nothing in the statute forecloses a court from denying the defendant's suppression motion on the basis of a good-faith exception to the exclusionary rule (or on some other basis, such as a procedural defect in the motion itself).

blood or urine sample. And most importantly, when the officers collected blood and urine samples from Brooks, they did so in accordance with this court's decision in *State v. Netland,* which approved of the warrantless collection of blood-alcohol evidence based on a single-factor exigency derived from the evanescent nature of alcohol in the bloodstream. 762 N.W.2d 202, 214 (Minn.2009) ("[U]nder the exigency exception, no warrant is necessary to secure a blood-alcohol test where there is probable cause to suspect a crime in which chemical impairment is an element of the offense."), *abrogated in part by Missouri v. McNeely,* —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013); *see also State v. Shriner,* 751 N.W.2d 538, 549–50 (Minn. 2008) ("The rapid, natural dissipation of alcohol in the blood creates single-factor exigent circumstances that will justify the police taking a warrantless, nonconsensual blood draw from a defendant, provided that the police have probable cause to believe that defendant committed criminal vehicular homicide or operation."), *abrogated by McNeely,* —— U.S. ——, 133 S.Ct. 1552. In short, the police officers in this case followed the law, including binding precedent from this court, to the letter.

Of course, with the benefit of hindsight, we now know that *Netland* was wrongly decided. But that was our mistake, not a mistake by law-enforcement officials. Law-enforcement officials cannot foretell the future—nor would we want them to try. Rather, as in *Davis,* "[t]he police acted in strict compliance with binding precedent, and their behavior was not wrongful." —— U.S. at ——, 131 S.Ct. at 2428–29. Excluding the blood-alcohol results in this case would not deter future unlawful searches—the "sole purpose" of the exclusionary rule. *Id.* at ——, 131 S.Ct. at 2438. Instead, applying the exclusionary rule in this case would allow Brooks to escape criminal liability not because he is innocent or the police acted culpably, but rather because *this* court failed to foresee *McNeely* when it decided *Netland.* Neither the Fourth Amendment nor Article I, Section, dictates such a result.