*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1080**

State of Minnesota,
Respondent,

vs.

Marcia Jean Schlingmann,
Appellant.

**Filed June 27, 2016
Reversed
Jesson, Judge**

Cottonwood County District Court
File No. 17-CR-14-56

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Ronald J. Schramel, Windom City Attorney, Kristi L. Meyeraan, Assistant City Attorney, Windom, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Jesson, Presiding Judge; Reilly, Judge; and Toussaint,

Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**JESSON**, Judge

Appellant Marcia Jean Schlingmann challenges her conviction of third-degree driving while impaired, arguing that the district court clearly erred by finding that she voluntarily consented to a blood test. Because the totality of the circumstances shows that Schlingmann was not mentally capable of giving her voluntary consent, we reverse. Schlingmann also argues that the district court abused its discretion by failing to give a requested jury instruction on the prescription-drug affirmative defense. Because our conclusion on the consent issue disposes of the matter in Schlingmann's favor, we do not reach this claim.

## FACTS

On the morning of December 2, 2013, Officer Partlow responded to the scene of an accident. Officer Partlow observed a Pontiac that appeared to have gone off the road and collided with a parked sport utility vehicle. A woman, who was later identified as Schlingmann, was unconscious in the driver seat of the Pontiac. Schlingmann was slouched over the steering wheel and was drooling.

Officer Partlow and another officer were able to get into the vehicle and wake Schlingmann. Emergency medical and fire personnel then arrived on the scene and transported Schlingmann to a nearby hospital. Officer Partlow went to the hospital to speak with Schlingmann about the accident. He found Schlingmann sitting up in a hospital bed with a nurse attending to her. Schlingmann told the officer that she did not remember anything about the accident. Schlingmann appeared disoriented and confused. She could

2

not tell the officer where she lived, did not know the day of the week, and made several statements that did not make sense. She also told the officer that she suffers from seizures.

Officer Partlow asked Schlingmann if she had insurance on the Pontiac. She told him that she thought she did and began looking through her wallet for an insurance card. Officer Partlow then said something into his portable radio. Schlingmann stopped looking through her wallet and repeated verbatim what the officer had said into the radio. She then forgot what she had been doing, and Officer Partlow had to remind her to continue looking for her insurance card. Schlingmann was unable to find the card and told the officer that she probably did not have insurance because she could not afford it. Later, however, a nurse gave the officer an insurance card, and the officer was able to determine that Schlingmann did have insurance on the vehicle.

Officer Partlow asked Schlingmann if she was on any prescription medication. She told him that she was, but was not able to say what medications she had been prescribed. Schlingmann also told the officer that she has diabetes, but a doctor later told him that Schlingmann's "sugar level was normal."

Because Schlingmann appeared disoriented and made statements during the interview that did not make sense, Officer Partlow believed she was under the influence of a controlled substance. Approximately 35 minutes after he was dispatched to the accident where he found Schlingmann unresponsive in her car, Officer Partlow read her the implied-consent advisory. *See* Minn. Stat. § 169A.51, subd. 2 (Supp. 2013) (setting out the implied-consent advisory). He informed her that he believed she had been driving while impaired and asked her to take a test to determine if she had been using alcohol or a controlled

3

substance. The officer told Schlingmann that Minnesota law required her to take a test and that refusal to take a test is a crime. He also told her that she had the right to speak with an attorney regarding her decision. When asked if she understood the advisory, Schlingmann answered, "Yes I do." When the officer asked Schlingmann if she wanted to consult with an attorney, Schlingmann first said that she did not know what to do and then mentioned someone being on vacation. She asked the officer what her rights were and if he was asking if she wanted to see a judge. The officer told her that she could contact an attorney in order to discuss the test. Schlingmann indicated that she did not have the money to pay for an attorney. The officer told her that she would have to contact the attorney on her own and indicated that the state would not pay for the attorney. The officer asked again if Schlingmann wanted to speak with an attorney and she said, "I don't think so." The officer then asked Schlingmann if she would take a blood test. Schlingmann said "yes."

A nurse drew two vials of blood from Schlingmann and they were submitted to the Minnesota Bureau of Criminal Apprehension (BCA) for testing. The BCA report showed that Schlingmann's blood contained a concentration of .098 milligrams per liter of amphetamine, a Schedule II controlled substance. Minn. Stat. § 152.02, subd. 3(d)(1) (2012).

Schlingmann was charged with two counts of third-degree driving while impaired (DWI).[1]  Minn. Stat. § 169A.26, subd. 1(a) (2012).  Count I alleged that Schlingmann

---

[1] A person is guilty of third-degree DWI if he or she violates Minn. Stat. § 169A.20, subd. 1 (2012), and one aggravating factor is present. Minn. Stat. § 169A.26, subd. 1(a). At trial, Schlingmann stipulated that she had a prior impaired driving-related loss of license within ten years of the current incident. This qualifies as an aggravating factor under Minn. Stat.

operated a motor vehicle while her body contained any amount of a controlled substance listed in Schedule I or II. Minn. Stat. § 169A.20, subd. 1(7) (2012). Count II alleged that Schlingmann operated a motor vehicle while under the influence of a controlled substance. Minn. Stat. § 169A.20, subd. 1(2) (2012).

Schlingmann asked the district court to suppress the results of the blood test, arguing that she did not voluntarily consent to the blood draw. The matter was submitted to the district court without testimony, based on the police reports of Officer Partlow, a copy of the implied-consent form used by the officer, and audio recordings of the officer's initial interview with Schlingmann and of the officer reading the implied-consent advisory. The district court found that Schlingmann's consent was voluntary and denied the motion.

At trial, Schlingmann testified that she suffers from seizures. She did not remember the accident, but testified that she believed she had a seizure. One of her seizure medications—Phenytoin—was found in her car after the accident. Schlingmann further testified that Officer Partlow's description of her unconscious in the car and drooling is consistent with how seizures have affected her in the past and that she usually does not remember a seizure or anything that happens for a period of time thereafter. Schlingmann also testified that she suffers from attention deficit hyperactivity disorder (ADHD) and takes amphetamine for this condition. She submitted a letter from her doctor saying that

---

§ 169A.26, subd. 1(a). *See* Minn. Stat. § 169A.03, subds. 3(1) (defining "aggravating factor" to include a "qualified prior impaired driving incident" within ten years of the current offense), 22 (2012) (defining "qualified prior impaired driving incident" to include "prior impaired driving-related losses of license").

the ADHD medication she is prescribed would have caused "a positive screen for amphetamine."

The jury returned a guilty verdict on count I and acquitted Schlingmann on count II. The district court adjudicated Schlingmann guilty on count I and sentenced her to 365 days in jail with 335 days of that sentence stayed for two years. This appeal follows.

## D E C I S I O N

Schlingmann argues that the district court clearly erred when it denied her motion to suppress the results of the blood test. She claims that because she was recently in an accident, was found unresponsive in her car, and was disoriented, her consent to the blood draw was not free and voluntary. We agree.[2]

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Taking a blood sample constitutes a search under the Fourth Amendment. *State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013). A warrantless search is unconstitutional unless it falls within one of the recognized exceptions to the warrant requirement. *State v. Flowers*, 734 N.W.2d 239, 248 (Minn. 2007). Consent is one of these recognized exceptions. *Brooks*, 838 N.W.2d at 568.

For the consent exception to apply, the state must prove by a preponderance of the evidence that the defendant freely and voluntarily consented to the search. *State v. Diede*, 795 N.W.2d 836, 846 (Minn. 2011). Voluntariness is determined by assessing the totality

---

[2] Schlingmann also argues that her consent was coerced "by a false threat of criminal prosecution" in the implied-consent advisory. Because we conclude that Schlingmann was mentally incapacitated and unable to freely and voluntarily consent, we do not reach this argument.

6

of the circumstances. *Brooks*, 838 N.W.2d at 568. This includes "the nature of the encounter, the kind of person the defendant is, and what was said and how it was said." *Diede*, 795 N.W.2d at 846 (quotation omitted).

The state points to the following facts to show that it proved Schlingmann's consent was voluntary: Schlingmann was not under arrest at the time of her consent; Officer Partlow read Schlingmann the implied-consent advisory and complied with all of the statutory requirements, including giving Schlingmann an opportunity to contact an attorney; and Schlingmann said "yes," when asked if she would take a blood test.

The district court found that the state had met its burden of proving voluntary consent. The court described the conversation between Schlingmann and Officer Partlow before the implied-consent advisory as follows:

> Officer Partlow went to the hospital to discuss the accident with Schlingmann. Schlingmann was disoriented and unable to clearly communicate or cooperate with Partlow. She stated she did not remember anything about the accident, nor did she remember what she was doing or where she was going before the accident. She could not recall what her address was or where she lived; what day of the week it was; what, if any, prescription medications she was on; or whether she had insurance. . . . She had difficulty in understanding and responding to the officer's questions, and often her response was out of context and not responsive to the officer's questions. Other times, she just repeated what Partlow had stated.

Nevertheless, after listening to the audio recording of the implied-consent portion of the conversation, where Schlingmann indicated she understood the advisory, indicated that she did not want to speak with an attorney, and indicated that she would submit to the blood draw, the district court found that Schlingmann's responses were not "out of the ordinary

7

for persons suspected of impaired driving" and that there "is no evidence of coercion, duress, deception, threats, or undue influence on the part of law enforcement." Based upon the lack of coercion, the district court found that Schlingmann's consent was freely and voluntarily given.

While the district court's determination that consent was free and voluntary is a finding of fact that is reviewed under the clearly erroneous standard, *Diede*, 795 N.W.2d at 846, we undertake our review knowing that "a suspect's voluntary consent to a search is a question subject to careful appellate review." *State v. Smallwood*, 594 N.W.2d 144, 155 (Minn. 1999) (quotation omitted). Findings of fact are clearly erroneous if, upon review of the entire record, this court is "left with the definite and firm conviction that a mistake occurred." *Diede*, 795 N.W.2d at 846-47.

We agree with the district court that there was no explicit coercion by Officer Partlow. But this does not end the inquiry into whether consent was freely and voluntarily given. We must examine the totality of the circumstances. *Brooks*, 838 N.W.2d at 568. Given the district court's findings that Schlingmann was disoriented and unable to clearly communicate or cooperate with Officer Partlow, the totality of the circumstances necessarily includes her mental state.

Few Minnesota cases focus on the mental capacity of an individual to consent to a search. The Minnesota Supreme Court has indicated, however, that this is a consideration by stressing that we must look to the totality of the circumstances to assess voluntariness and that the circumstances include "the kind of person the defendant is." *Diede*, 795 N.W.2d at 846 (quotation omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 229,

8

93 S. Ct. 2041, 2049 (1973) (stating that in determining whether consent was freely and voluntarily given, the "possibly vulnerable subjective state of the person who consents" must be considered).

In *Smallwood*, the supreme court discussed whether a defendant's intoxication precluded him from giving voluntary consent to a search. 594 N.W.2d at 155-56. The court ultimately concluded that Smallwood's consent was voluntary. *Id.* at 156. Smallwood, while intoxicated, was able to communicate with law enforcement. *Id.* at 155. Although the supreme court found Smallwood's consent voluntary, the case leaves open the possibility that intoxication or another mental impairment may limit a person's ability to give voluntary consent.[3]

As the district court found, when Officer Partlow first spoke with Schlingmann, she was disoriented and unable to clearly communicate. She was unable to remember basic information such as her address and the day of the week, made nonsensical statements, and at times would just repeat verbatim what she heard the officer say. Yet the district court appeared to separate this portion of Officer Partlow's interview with Schlingmann from the reading of the implied-consent advisory, finding that Schlingmann's responses to the

---

[3] Other jurisdictions explicitly take account of the individual's mental or emotional state to assess whether consent is freely and voluntarily given. *See, e.g.*, *United States v. Reynolds*, 646 F.3d 63, 73 (1st Cir. 2011) ("Mental competency is certainly a factor to be considered when evaluating voluntariness."); *United States v. Castellanos*, 518 F.3d 965, 970-71 (8th Cir. 2008) (concluding that defendant "did not possess the capacity to give implied consent" and stating that his "mental capacity to consent to a search of his residence was unquestionably compromised"); *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005) (stating that "mental health and capability of the person giving consent" is "[a]mong the factors that aid in determining whether consent was freely given").

advisory were not "out of the ordinary." In doing so, the district court clearly erred. The record shows, and the district court found, that only 35 minutes passed from the time that Officer Partlow first received the accident report that Schlingmann was unresponsive in her car to the time Schlingmann was read the implied-consent advisory at the hospital. This indicates that Schlingmann was read the implied-consent advisory soon after, if not immediately following, the initial interview and that she was still extremely disoriented when she consented to the blood draw.

We also note that some of Schlingmann's responses to the implied-consent advisory show that she remained disoriented. When Officer Partlow asked Schlingmann if she wanted to speak with an attorney, the district court found, and the audio recording shows, that she said "I can't remember" and then said something unintelligible. She then said, "So I don't know what to do, because what's her face, ummm, she was on vacation, and it was, ummm . . . ." Schlingmann trailed off and the officer had to repeat, "Do you wish to talk to an attorney?" Although Officer Partlow had clearly asked if Schlingmann wanted to speak with an attorney, Schlingmann then questioned whether the officer was asking if she wanted to see a judge. In light of Schlingmann's previous statements, this demonstrates that she was disoriented through the implied-consent advisory.

We agree with the district court that Officer Partlow read Schlingmann each portion of the implied-consent advisory and Schlingmann indicated to the officer that she understood the advisory, that she did not need to speak with an attorney, and that she consented to the blood draw. As the supreme court held in *Brooks*, under normal circumstances, this would have supported a finding of voluntariness. *See* 838 N.W.2d at

10

571-72. The implied-consent advisory informs the defendant of the right to refuse a test and gives the defendant an opportunity to contact an attorney. *Id.* But in this case, the totality of the circumstances shows that Schlingmann was not mentally capable of understanding the advisory or the significance of the decision it asked her to make. Accordingly, the reading of the advisory does not support the district court's finding of voluntary consent.

Moreover, in *Brooks*, the defendant "consulted with counsel before agreeing to take each test," and our supreme court concluded that this "reinforce[d]" the finding of voluntariness. *Id.* at 571. Schlingmann did not speak with an attorney and had to navigate the implied-consent advisory alone in her disoriented state.

This case also differs significantly from *Smallwood*. 594 N.W.2d at 155-156. In *Smallwood*, the supreme court affirmed the district court's finding of voluntary consent because Smallwood was able to communicate with the officers. *Id.* Smallwood had experience with the criminal justice system and was able to articulate a desire for a plea agreement in accordance with the Minnesota Sentencing Guidelines. In this case, the district court specifically found that Schlingmann was "unable to clearly communicate or cooperate with [Officer] Partlow." Shortly before reading Schlingmann the advisory, Officer Partlow noted that Schlingmann did not know the day of the week, did not know what happened during or before the accident, and did not know where she lived. Under these circumstances, Schlingmann could not have possessed the mental awareness to understand the implied-consent advisory or have had a reasonable appreciation of the significance of her actions.

11

In addition to the ample evidence of Schlingmann's disorientation noted by the district court, the record indicates that Schlingmann's accident was caused by a severe seizure. Schlingmann told Officer Partlow that she suffers from seizures, and Schlingmann had anti-seizure medication in her vehicle. Also, when Office Partlow discovered Schlingmann, she was unconscious and drooling in her car.

After thoroughly reviewing this record, we are left with the firm conviction that Schlingmann's disoriented state rendered her incapable of voluntarily consenting to the blood draw.[4] Consent is an exception to the fundamental right to be free from unreasonable, warrantless searches. *Brooks*, 838 N.W.2d at 568. To invoke this exception, the state must prove by a preponderance of the evidence that consent was free and voluntary. *Diede*, 795 N.W.2d at 846. Given the district court's own factual findings that Schlingmann "was disoriented and unable to clearly communicate or cooperate" with Officer Partlow, we cannot agree with the district court that Schlingmann freely and voluntarily consented to the blood draw.

We acknowledge that DWI suspects are often suffering from some level of disorientation and yet capable of providing free and voluntary consent. Our decision is

---

[4] The implied-consent statute authorizes a search of a driver's blood, breath, or urine without a driver's express consent when the driver is unconscious or otherwise incapable of consenting or refusing consent to chemical testing. Minn. Stat. § 169A.51, subd. 6 (2012). Because the state does not contend that this provision authorizes the blood draw in this case, we do not address it. We note, however, that constitutional application of this provision requires an exigency to preserve evidence. *State v. Wiehle*, 287 N.W.2d 416, 418-19 (Minn. 1979). The state has not raised the exigent-circumstances exception to the warrant requirement, and the natural dissipation of alcohol or a controlled substance in the bloodstream does not provide a per se exigency to conduct a blood test without a warrant. *Missouri v. McNeely*, __ U.S. __, __, 133 S. Ct. 1552, 1568 (2013).

narrow and based on the unique circumstances presented. The totality of those circumstances indicate that Schlingmann was so severely disoriented that she did not have the capacity to provide free and voluntary consent.

The district court's finding of voluntary consent is clearly erroneous, and the blood test results must be suppressed. Schlingmann was only convicted of operating a motor vehicle while her body contained a Schedule I or II substance. Without the blood test results, the state does not have the evidence to retry Schlingmann on this charge. Accordingly, we reverse without remanding for a new trial.

**Reversed.**