**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1855**

Rita Ann Stevens, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed July 14, 2014
Affirmed
Johnson, Judge
Concurring specially, Chutich, Judge**

Hennepin County District Court
File No. 27-CV-12-25002

Shane C. Perry, Perry & Perry, PLLP, Minneapolis, Minnesota (for appellant)

Lori Swanson, Attorney General, James E. Haase, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Johnson, Presiding Judge; Rodenberg, Judge; and Chutich, Judge.

## S Y L L A B U S

Minnesota's implied-consent statute does not violate the unconstitutional-conditions doctrine by authorizing the commissioner of public safety to revoke the driver's license of a person who has been arrested for driving while impaired and has refused to submit to chemical testing.

# O P I N I O N

**JOHNSON**, Judge

The commissioner of public safety revoked Rita Ann Stevens's driver's license after she was arrested for driving while impaired and refused to submit to chemical testing. On judicial review, the district court sustained the commissioner's revocation. On appeal, Stevens makes two arguments. First, she argues that the evidence is insufficient to prove that she refused to submit to chemical testing. Second, she argues that the implied-consent statute is unconstitutional because it violates the unconstitutional-conditions doctrine. We affirm.

## FACTS

At noon on November 19, 2012, a police officer was dispatched to a possible hit-and-run accident in a parking lot in the city of Minnetonka. The officer identified Stevens as the driver of a Jeep that had hit a parked car multiple times. Because Stevens appeared to be intoxicated, the officer asked her to perform field sobriety tests, which she failed. The officer also asked Stevens to take a preliminary breath test (PBT), but she did not cooperate. The officer arrested Stevens on suspicion of driving while impaired (DWI) and brought her to the police station.

At 12:47 p.m., the officer read Stevens the implied-consent advisory. Stevens indicated that she did not wish to speak with an attorney. At 1:07 p.m., Stevens agreed to take a breath test, but the breath-test equipment malfunctioned. The officer then re-read the implied-consent advisory and offered Stevens the option of taking either a blood test or a urine test. Stevens expressed verbal agreement to take a urine test, but Stevens did

2

not provide a urine sample after the female officer who administered the urine test gave her three opportunities to do so. The female officer told the arresting officer that she believed that Stevens was not making a good-faith effort to provide a urine sample. The arresting officer informed Stevens that he was deeming her to have refused to submit to chemical testing. The arresting officer noted Stevens's refusal on the implied-consent form, which he signed at 2:52 p.m.

The commissioner revoked Stevens's driver's license. In December 2012, Stevens petitioned for judicial review of the commissioner's revocation of her license. *See* Minn. Stat. § 169A.53, subd. 2 (2012). In June 2013, Stevens amended her petition, and the district court conducted an implied-consent hearing. Stevens was represented by counsel and was present at the hearing. At the outset of the hearing, Stevens's attorney identified two issues that are relevant to this appeal: whether Stevens refused to submit to chemical testing and "*McNeely* issues." The commissioner called one witness, the arresting officer, and offered an exhibit consisting of the implied-consent peace-officer's certificate and the implied-consent advisory. Stevens did not testify.

In August 2013, the district court issued a 13-page order and memorandum in which it sustained the commissioner's order of revocation. The district court found that Stevens's conduct properly was deemed to be a refusal to submit to chemical testing. The district court rejected Stevens's *McNeely*-based argument by concluding that the implied-consent statute satisfies the reasonableness requirement of the Fourth Amendment and, thus, is not unconstitutional. Stevens appeals.

**ISSUES**

I.       Is the evidence in the record sufficient to allow the district court to find that Stevens refused to submit to chemical testing?

II.      Does Minnesota's implied-consent statute violate the unconstitutional-conditions doctrine by authorizing the commissioner of public safety to revoke the driver's license of a person who was arrested for DWI and refused to submit to chemical testing?

**ANALYSIS**

**I.**

Stevens first argues that the evidence in the record of the implied-consent hearing is insufficient to allow the district court to find that she refused to submit to chemical testing.

A law-enforcement officer may request that a driver submit to a chemical test of the person's blood, breath, or urine, if the officer has "probable cause to believe the person was driving, operating, or in physical control of a motor vehicle" while impaired. Minn. Stat. § 169A.51, subd. 1(b) (2012). If a driver refuses to permit a test, "a test must not be given," Minn. Stat. § 169A.52, subd. 1 (2012), but the commissioner of public safety shall revoke the person's driver's license for one year or more, *id.*, subd. 3(a). If a driver expresses verbal agreement to submit to chemical testing but does not provide an adequate sample, his or her conduct may be deemed a refusal to submit to chemical testing. *Busch v. State, Comm'r of Pub. Safety*, 614 N.W.2d 256, 259-60 (Minn. App. 2000); *see also State v. Ferrier*, 792 N.W.2d 98, 100-02 (Minn. App. 2010) (affirming

4

conviction of refusal to submit to chemical testing), *review denied* (Minn. Mar. 15, 2011). To determine whether a driver's failure to provide a sample constitutes refusal, a court should look to the driver's words and actions. *Gabrick v. State, Comm'r of Pub. Safety*, 393 N.W.2d 23, 25 (Minn. App. 1986). The question whether a driver has refused to submit to chemical testing is a question of fact, to which this court applies a clear-error standard of review. *Lynch v. State, Comm'r of Pub. Safety,* 498 N.W.2d 37, 38-39 (Minn. App. 1993).

Stevens does not dispute that she did not provide a urine sample, but she contends that the evidentiary record is lacking because it does not reflect the amount of time that the arresting officer gave her to provide a sample. Stevens asserts that, "to meet its burden of proof, Respondent was obligated to establish the amount of time Appellant was given to produce a urine sample before [the officer] deemed her to have refused." She cites no authority for the premise that a finding of refusal-by-conduct must include a finding concerning the amount of time allowed for providing a test sample. The district court rejected Stevens's argument by citing *State, Dep't of Highways v. Lauseng*, 289 Minn. 344, 183 N.W.2d 926 (1971), in which the supreme court stated that a driver's "election of one of the alternative chemical tests . . . presupposes the driver's ability to supply, within a reasonable time, a sample essential to that test," and further stated that an officer need not "await the driver's convenience of a different time or place." *Id.* at 345, 183 N.W.2d at 927. The district court correctly reasoned that neither the implied-consent statute nor the caselaw requires the commissioner to prove that a driver had any particular amount of time in which to provide a sample.

5

Even if we construe Stevens's brief broadly to argue that she did not refuse because she was not given a reasonable amount of time to produce a urine sample, her argument still would fail. The district court found that the arresting officer read Stevens the implied-consent advisory at 12:47 p.m., that she agreed to take a urine test shortly after 1:07 p.m., and that the officer deemed her to have refused testing and completed the implied-consent form at 2:52 p.m. These findings allow an inference that Stevens had a reasonable amount of time to provide a urine sample such that the absence of a urine sample was intentional. Moreover, the record includes the female officer's observation that Stevens was not making a good-faith effort to provide a urine sample. The district court found that Stevens "was given three opportunities to provide a urine sample, but did not do so."

In sum, the evidence is sufficient to support the district court's finding that Stevens refused to submit to chemical testing. Thus, the district court's finding of refusal is not clearly erroneous.

## II.

Stevens also argues that the district court erred by rejecting her argument that Minnesota's implied-consent statute is unconstitutional. The constitutionality of a statute is a question of law, to which this court applies a *de novo* standard of review. *State v. Ness*, 834 N.W.2d 177, 181 (Minn. 2013). We presume that Minnesota statutes are constitutional and will declare a statute unconstitutional "with extreme caution and only when absolutely necessary." *Id.* at 182 (quotation omitted). The party challenging a statute on constitutional grounds must meet "the very heavy burden of demonstrating

6

beyond a reasonable doubt that the statute is unconstitutional." *State v. Johnson*, 813 N.W.2d 1, 11 (Minn. 2012) (quotation omitted).

In the implied-consent statute, the Minnesota legislature declared that any person "who drives, operates, or is in physical control of a motor vehicle within this state or on any boundary water of this state consents . . . to a chemical test of that person's blood, breath, or urine for the purpose of determining the presence of alcohol."  Minn. Stat. § 169A.51, subd. 1(a).  A law-enforcement officer may impose this duty on a person if the officer has probable cause that the person has committed the offense of DWI and if the person has been arrested for DWI.  Minn. Stat. § 169A.51, subd. 1(b).  But if a person refuses to submit to chemical testing, "a test must not be given."  Minn. Stat. § 169A.52, subd. 1; *see also State v. Brooks*, 838 N.W.2d 563, 571 (Minn. 2013) ("If a driver refuses the test, the police are required to honor that refusal and not perform the test."), *cert. denied*, 134 S. Ct. 1799 (2014).  A consequence of such a refusal, however, is that the commissioner of public safety will temporarily revoke the person's driver's license. Minn. Stat. § 169A.52, subd. 3.  The authorization to revoke a driver's license for test refusal was enacted in 1961 and has remained in the statutes ever since.  *See* 1961 Minn. Laws ch. 454, § 4, at 715 (codified at Minn. Stat. § 169.121, subd. 4 (1962)).[1]

---

[1]In addition, there are criminal penalties for refusing to submit to chemical testing. In 1989, the legislature made test refusal a gross misdemeanor for certain repeat offenders.  *See* 1989 Minn. Laws ch. 290, art. 10, § 3, at 1659 (codified at Minn. Stat. § 169.121, subd. 3 (1990)).  In 1992, the legislature made test refusal a misdemeanor for all drivers.  *See* 1992 Minn. Laws ch. 570, art. 1, § 7, at 1948 (codified at Minn. Stat. § 169.121, subd. 3 (1992)).  In 2003, the legislature made test refusal a gross misdemeanor for all drivers.  *See* 2003 Minn. Laws. 1st Spec. Sess. ch. 2, art. 9, § 5, at 1446 (codified at Minn. Stat. § 169A.26 (Supp. 2003)).

Stevens contends that Minnesota's implied-consent statute violates the unconstitutional-conditions doctrine because it imposes on a driver a choice between, on the one hand, relinquishing the Fourth Amendment right to be free from an unreasonable search and, on the other hand, relinquishing a license to drive a motor vehicle. The unconstitutional-conditions doctrine is a creature of federal law that may, in some situations, be invoked to protect or vindicate a constitutional right. *See Frost v. Railroad Comm'n of Cal.*, 271 U.S. 583, 592-93, 46 S. Ct. 605, 607 (1926). The Minnesota Supreme Court has explained the doctrine in this way:

> [A]s a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

*State v. Netland*, 762 N.W.2d 202, 211 (Minn. 2009) (alteration in original) (quoting *Frost*, 271 U.S. at 593-94, 46 S. Ct at 607), *abrogated in part by Missouri v. McNeely*, 133 S. Ct. 1552 (2013), *as recognized in Brooks*, 838 N.W.2d at 567. In essence, "the unconstitutional conditions doctrine reflects a limit on the state's ability to coerce waiver of a constitutional right where the state may not impose on that right directly." *Id.* The supreme court in *Netland* also stated, "'Although it has a long history, . . . the "unconstitutional conditions" doctrine has for just as long suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law

8

that operates with equal force regardless of the nature of the rights and powers in question.'" *Id.* (alteration in original) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12, 114 S. Ct. 2309, 2328 n.12 (1994)). Despite uncertainty about the applicability of the doctrine, the supreme court resolved the *Netland* case by stating that, if the unconstitutional-conditions doctrine applies, it requires, at a minimum, that the driver "establish that the criminal test-refusal statute authorizes an unconstitutional search." *See id.* at 212.

We note that Stevens is asserting an unconstitutional-conditions argument in the context of a civil action in which she seeks to rescind the temporary revocation of her driver's license. Because this is a civil action, we need not decide whether Stevens has been subjected to an unconstitutional condition on her Fourth Amendment rights by the criminal consequences of a refusal to submit to chemical testing.

Stevens's unconstitutional-conditions argument fails for four reasons, as described below.

**A.**

First, Stevens's unconstitutional-conditions argument fails because there is no authority for the proposition that the unconstitutional-conditions doctrine applies to a constitutional challenge based on the Fourth Amendment. The Minnesota Supreme Court has not so held. In *Netland*, the supreme court specifically refrained from holding that the doctrine applies to a Fourth Amendment challenge to the implied-consent statute. *Id.* The supreme court noted that the unconstitutional-conditions doctrine has been applied "in the context of privileges conditioned on infringement of individual liberty rights, such

9

as First Amendment freedoms of speech, religious expression, and association" but that "[t]he application of this doctrine to other constitutional rights is less clear." *Id.* at 211. The supreme court resolved Netland's unconstitutional-conditions argument by reasoning that, if the doctrine were to apply, Netland would not be able to satisfy a required element of the doctrine, that the statute authorizes an unconstitutional search. *See id.* at 212-14. The supreme court did not address the unconstitutional-conditions doctrine four years later in *Brooks*, which focused on the case-specific, fact-bound question whether, in light of the totality of the circumstances, the appellant's consent was valid or was coerced. *See* 838 N.W.2d 567-73. Because the supreme court did not hold in either *Netland* or *Brooks* that the unconstitutional-conditions doctrine applies to a Fourth Amendment challenge to Minnesota's implied-consent statute, Stevens cannot establish that the doctrine applies in this case.[2]

In addition, the United States Supreme Court has not held that the unconstitutional-conditions doctrine may be invoked to protect Fourth Amendment rights. As our supreme court has observed, the United States Supreme Court has applied the doctrine only in connection with other constitutional rights. *See Netland*, 762 N.W.2d at 211. In one case involving a Fourth Amendment challenge, the Court briefly alluded to the unconstitutional-conditions doctrine but nonetheless declined to apply the doctrine.

---

[2]We acknowledge that this court applied the unconstitutional-conditions doctrine to a Fourth Amendment challenge in *Netland*. *See State v. Netland*, 742 N.W.2d 207, 213-14 (Minn. App. 2007), *aff'd in part*, *rev'd in part*, 762 N.W.2d 202 (Minn. 2009). But on further review, the supreme court refrained from adopting the unconstitutional-conditions doctrine. *Netland*, 762 N.W.2d at 212. We of course must look to the supreme court's interpretation and application of the unconstitutional-conditions doctrine as the governing law on the issue.

*See United States v. Knights*, 534 U.S. 112, 118 & n.4, 122 S. Ct. 587, 591 & n.4 (2001) (upholding condition of probation that required probationer to consent to warrantless searches of home). Similarly, the Supreme Court declined to address the unconstitutional-conditions doctrine in a case concerning the Fifth Amendment right against self-incrimination, even though the court of appeals had rested its decision on that concept and the respondent had urged the Supreme Court to rely on the doctrine. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 285-88, 118 S. Ct. 1244, 1252-53 (1998) (upholding procedure that allowed clemency applicant to request interview with parole board). These cases indicate that the Supreme Court is disinclined to adopt the unconstitutional-conditions doctrine in the context of the Fourth Amendment.

**B.**

Second, even if the unconstitutional-conditions doctrine were to apply, we nonetheless would conclude that Stevens's unconstitutional-conditions argument fails because she would not be able to satisfy the requirement that the implied-consent statute "authorizes an unconstitutional search." *See Netland*, 762 N.W.2d at 212.

Stevens cannot show that the implied-consent statute authorizes a search that violates the Fourth Amendment because the implied-consent statute, by itself, does not authorize any search given the facts of this case. Contrary to its common title, the implied-consent statute does not authorize a warrantless search of a person's blood, breath, or urine by implying, as a matter of law, that every licensed driver has consented to such a search. The supreme court made this clear in *Brooks* by stating, "we do not hold that Brooks consented because Minnesota law provides that anybody who drives in

11

Minnesota 'consents . . . to a chemical test.'" 838 N.W.2d at 572 (alteration in original) (quoting Minn. Stat. § 169A.51, subd. 1(a)). In most situations,[3] the plain language of the statute authorizes a search of a driver's blood, breath, or urine *only* if the driver gives express, valid consent to such a search. *See* Minn. Stat. §§ 169A.51-.52. But if a driver refuses to consent to chemical testing under the implied-consent statute, the law-enforcement officer must refrain from proceeding with a test. *See* Minn. Stat. § 169A.52, subd. 1; *Brooks*, 838 N.W.2d at 569. Express consent is a recognized exception to the warrant requirement. *Brooks*, 838 N.W.2d at 568. Thus, the implied-consent statute does not authorize a search of a driver such as Stevens in a manner that is inconsistent with the Fourth Amendment; to the contrary, the implied-consent statute respects the requirements of the Fourth Amendment.

## C.

Third, even if (a) the unconstitutional-conditions doctrine were to apply, and (b) the implied-consent statute were to authorize a search, we nonetheless would conclude that Stevens would not be able to establish that the implied-consent statute authorizes a search that violates the Fourth Amendment. *See Netland*, 762 N.W.2d at 212.

---

[3]The implied-consent statute authorizes a search of a driver's blood, breath, or urine without the driver's express consent in two circumstances. The first is when there is probable cause to believe that the driver has committed the offenses of criminal vehicular homicide or criminal vehicular operation. Minn. Stat. § 169A.52, subd. 1; *see also* Minn. Stat. § 609.21, subd. 1 (2012); *Brooks*, 838 N.W.2d at 569 n.3. In that situation, an officer may require a test "despite the person's refusal." Minn. Stat. § 169A.52, subd. 1; *see also Brooks*, 838 N.W.2d at 569 n.3. The second circumstance is when the driver is unconscious or otherwise incapable of consenting to chemical testing or refusing to consent. Minn. Stat. § 169A.51, subd. 6.

The commissioner contends that Stevens's constitutional challenge fails because the implied-consent statute is a reasonable means of promoting the state's interest in enforcing its DWI laws. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, a search of a person requires a search warrant. *See Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968). But a warrantless search of a person is valid under the Fourth Amendment if the search is justified by a recognized exception to the warrant requirement, such as consent or exigent circumstances. *See McNeely*, 133 S. Ct. at 1558.

Notwithstanding the above-stated general rule, the United States Supreme Court sometimes analyzes the validity of a warrantless search simply by asking whether the search was reasonable. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S. Ct. 2386, 2390 (1995). A general reasonableness analysis may be appropriate "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* at 653, 115 S. Ct. at 2391 (quotation omitted). Whether a particular search satisfies the reasonableness standard "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 652-53, 115 S. Ct. at 2390 (quotation omitted).

The Supreme Court opinion in *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402 (1989), is helpful in resolving this issue. In that case, the Court

13

considered federal regulations that required railroads to administer suspicionless drug and alcohol tests to any railroad employee who was involved in a major accident. *Id.* at 609-10, 109 S. Ct. at 1409. The regulations provided, among other things, that employees who refused to provide blood or urine samples may be disqualified from work for nine months. *Id.* at 610-11, 109 S. Ct. at 1409. The question before the Court was whether the warrantless, suspicionless searches conducted pursuant to the regulations violated the railroad employees' Fourth Amendment rights. *Id.* at 606, 109 S. Ct. at 1407. The Court invoked the special-needs exception to the warrant requirement and balanced the intrusion on the employees' privacy interests against the government's need to conduct the searches. *Id.* at 620, 109 S. Ct. at 1415. The Court reasoned that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively," *id.* at 627, 109 S. Ct. at 1418, and that the tests do not constitute "an unduly extensive imposition on an individual's privacy and bodily integrity," *id.* at 625, 109 S. Ct. at 1417 (quotation omitted). The Court also reasoned that the government's need to conduct the searches was great because it has a compelling interest in "ensuring the safety of the traveling public and of the employees themselves," *id.* at 621, 109 S. Ct. 1415, and that this goal is dependent on the sobriety of railroad employees, *id.* at 627, 109 S. Ct. 1418-19. The Court noted evidence that on-the-job intoxication was a significant problem in the railroad industry, that a significant number of railway accidents involved drugs or alcohol, and that a significant number of accidents resulted in fatalities, non-fatal injuries, and millions of dollars in property damage. *Id.* at 606-07, 109 S. Ct. 1407-08. Ultimately, the Court concluded that the government's

14

compelling interests outweighed the individuals' privacy interests such that the regulations were reasonable and, thus, constitutional. *Id.* at 633, 109 S. Ct. at 1421-22.

For similar reasons, the implied-consent statute also satisfies the general reasonableness requirement of the Fourth Amendment. The first factor we must consider is the "promotion of legitimate governmental interests." *See Vernonia Sch. Dist.*, 515 U.S. at 653, 115 S. Ct. at 2390 (quotation omitted). These interests are especially strong in this case. For decades, the harms caused by drunken driving have been a matter of serious concern. *See, e.g.*, *State v. Hanson*, 543 N.W.2d 84, 89-90 (Minn. 1996); *State v. Willis*, 332 N.W.2d 180, 186 (Minn. 1983) (Peterson, J., concurring specially); *see also South Dakota v. Neville*, 459 U.S. 553, 558, 103 S. Ct. 916, 920 (1983) (noting that "carnage caused by drunk drivers is well documented"); *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S. Ct. 408, 412 (1957) (noting "increasing slaughter on our highways"); *State v. Henning*, 666 N.W.2d 379, 386-91 (Minn. 2003) (Meyer, J., dissenting) (reasoning that suspicionless stop of driver with special license plates, conducted pursuant to statute, was reasonable). In 2000, the legislature enacted a new chapter of the Minnesota Statutes to address drunken driving in a more extensive manner. *See* 2000 Minn. Laws. ch. 478, art. I, § 7 (codified at Minn. Stat. §§ 169A.01-.76 (2000)); *compare* Minn. Stat. §§ 169A.01-.76 (2000) *with* Minn. Stat. § 169.121-.123 (1998). Yet a significant number of persons still are killed or injured each year in Minnesota in motor-vehicle accidents involving alcohol.[4] The frequency and extent of the problem of

---

[4]In 2012, 131 persons were killed, and 2,644 were injured, in motor-vehicle accidents involving alcohol in Minnesota. Office of Traffic Safety, Minn. Dep't of Pub.

drunken driving in Minnesota appears to be greater than the situation that justified the federal regulations at issue in *Skinner*, in which, over a 12-year period, "the nation's railroads experienced at least 21 significant train accidents involving alcohol or drug use as a probable cause or contributing factor," resulting in "25 fatalities [and] 61 non-fatal injuries." *See* 489 U.S. at 607, 109 S. Ct. at 1408 (quotation omitted). These statistics indicate that the state's interest in removing a driver from the roads after an arrest for DWI is at least as strong, if not stronger, than the government's interest in removing a railroad employee from the workplace if the employee failed a drug or alcohol test.

More specifically, there is no dispute that the state has a strong interest in ensuring the safety of its roads and highways or that the state serves that goal by temporarily revoking the driver's licenses of persons who have been arrested for DWI. These principles are clearly stated in two Supreme Court opinions that analyzed implied-consent statutes under the Due Process Clause. In *Mackey v. Montrym*, 443 U.S. 1, 99 S. Ct. 2612 (1979), the state of Massachusetts suspended a man's driver's license pursuant to its implied-consent statute because he refused to consent to chemical testing. *Id.* at 5-6, 99 S. Ct. at 2614-15. The driver argued that his right to due process was denied because his license was suspended administratively, without a pre-suspension hearing. *Id.* at 8, 99 S. Ct. at 2616. The Court rejected the argument. *Id.* at 19, 99 S. Ct. at 2621. In the course of analyzing the state's interests in its implied-consent procedures, the

Safety, *Minnesota Impaired Driving Facts* 37, 39 (2013), *available at* https://dps.mn.gov/divisions/ots/educational-materials/Documents/IMPAIRED-DRIVING-FACTS-2012.pdf. Furthermore, 26% of traffic fatalities in Minnesota in 2012 involved drivers with an alcohol concentration of more than .08. *Id.* at 37. Moreover, in 2012, 28,418 persons were arrested for DWI in Minnesota. *Id.* at 4.

Court noted that states have an interest "in removing drunken drivers from their highways" and that it has "traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety." *Id.* at 17, 99 S. Ct. at 2620. Likewise, in *Illinois v. Batchelder*, 463 U.S. 1112, 103 S. Ct. 3513 (1983), a man's driver's license was suspended pursuant to an implied-consent statute because he refused to consent to chemical testing, and the driver argued that his right to due process was denied because the law-enforcement officer did not set forth in writing the particular circumstances that caused the officer to believe that he was driving while intoxicated. *Id.* at 1115-16, 103 S. Ct. at 3515. The Court rejected this argument as well, noting, "The interest of the States in depriving the drunk driver of permission to continue operating an automobile is particularly strong." *Id.* at 1118, 103 S. Ct. at 3516.

We also must consider a second factor, the "intrusion on the individual's Fourth Amendment interests." *Vernonia Sch. Dist.*, 515 U.S. at 653, 115 S. Ct. at 2390 (quotation omitted). The *Skinner* Court reasoned that the intrusion on a person's privacy interests is diminished if the person is participating in a highly regulated activity. 489 U.S. at 625-27, 109 S. Ct. at 1417-19. The *Skinner* Court concluded that, in such a context, chemical testing does not constitute "an undue infringement on the justifiable expectations of privacy" of the individual. 489 U.S. at 633, 109 S. Ct. at 1422. Similarly, a licensed driver in Minnesota is subject to a multitude of traffic regulations that govern his or her driving. *See generally* Minn. Stat. §§ 169.011-169A.78 (2012). In addition, a licensed driver in Minnesota is presumed to be familiar with the laws governing the operation of a motor vehicle. *See Seitzer v. Halverson*, 231 Minn. 230,

17

236, 42 N.W.2d 635, 639 (1950). Accordingly, a licensed driver is presumed to be aware that he or she may be asked to submit to chemical testing upon being arrested for DWI. *See* Minn. Stat. § 169A.51, subd. 1(a). Furthermore, a licensed driver is likely to be aware that law-enforcement officers regularly patrol the state's roads and highways and will stop a vehicle to investigate suspected violations of laws. *See, e.g.*, *State v. Anderson*, 683 N.W.2d 818, 823 (Minn. 2004). Thus, a licensed driver in Minnesota has a diminished expectation of privacy with respect to enforcement of the state's DWI laws.

Furthermore, the implied-consent statute contains numerous prerequisites that must be satisfied before an officer may request that a driver submit to chemical testing. As the district court observed:

> The process is only invoked after there is probable cause to arrest a person for DWI, a legislatively prescribed notice is read to the arrested person, and the person has the right to consult with an attorney. The police may only use approved testing procedures and methods, and the person has a right to get their own second test. In addition, if the police request a breath sample, and a person declines, the police must offer an alternative test method, such as a urine test. If a person declines to cooperate (i.e. refuses), the police do not take a BAC sample without a warrant. The entire Implied Consent process is typically recorded to help insure that the police officer follows the specific statutory requirements and to permit later judicial review. Deviation from these clearly and narrowly prescribed requirements results in suppression of the test results and reinstatement of suspended driving privileges.

*See* Minn. Stat. §§ 169A.51-.52. In these ways, Minnesota's implied-consent statute contains even more safeguards than the suspicionless-search procedures that were upheld in *Skinner* and, thus, is at least as reasonable, if not more reasonable, for Fourth Amendment purposes than the procedures in *Skinner*.

18

In two criminal cases, the Supreme Court has commented favorably on the efficacy of implied-consent statutes that impose civil consequences. In *Neville*, the Supreme Court rejected a Fifth Amendment challenge to an implied-consent statute that allowed a person's test refusal to be admitted into evidence in a subsequent criminal prosecution. 459 U.S. at 562, 103 S. Ct. at 921; *see also McDonnell v. State, Comm'r of Pub. Safety*, 473 N.W.2d 848, 853-56 (Minn. 1991) (applying *Neville*). The *Neville* Court commented on the provision of the state law that required the revocation of a driver's license, stating, "Such a penalty for refusing to take a blood-alcohol test is unquestionably legitimate, assuming appropriate procedural protections." 459 U.S. at 560, 103 S. Ct. at 920. Most recently, in *McNeely*, the Court noted with apparent approval that "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." 133 S. Ct. at 1566 (plurality opinion). The Court stated that these laws "impose significant consequences when a motorist withdraws consent" in that "typically the motorist's driver's license is immediately suspended or revoked." *Id.*; *see also Brooks*, 838 N.W.2d at 572 (quoting *McNeely*, 133 S. Ct. at 1566). These comments support the conclusion that Minnesota's implied-consent statute is reasonable.

The reasonableness of Minnesota's implied-consent statute is bolstered by Supreme Court caselaw in which individuals have faced civil consequences for a refusal to waive their Fourth Amendment rights. One pertinent case is *Wyman v. James*, 400 U.S. 309, 91 S. Ct. 381 (1971), which concerned a person's Fourth Amendment right to

19

be free from unreasonable searches of her home. *Id.* at 316, 91 S. Ct. at 385. The state of New York sought to discontinue a woman's welfare benefits after she refused to permit a home visit, which was a statutory condition of receiving benefits. *Id.* at 313-14, 91 S. Ct. at 384. The Court considered whether the statutory condition violated the woman's Fourth Amendment rights. *Id.* at 316, 91 S. Ct. at 385. The Court reasoned that, if the home visits were a search for Fourth Amendment purposes, the statutory condition would be reasonable and, therefore, not unconstitutional. *Id.* at 318, 91 S. Ct. at 386. The Court stated that the woman "has the 'right' to refuse the home visit, but a consequence in the form of cessation of aid . . . flows from that refusal. The choice is entirely hers, and nothing of constitutional magnitude is involved." *Id.* at 324, 91 S. Ct. at 389. Stevens's reliance on the unconstitutional-conditions doctrine in this case is inconsistent with the Court's reasoning in *Wyman*.

The reasonableness of Minnesota's implied-consent statute is buttressed by Supreme Court caselaw concerning laws that authorize searches as a condition of a license issued pursuant to a regulatory scheme. In *New York v. Burger*, 482 U.S. 691, 107 S. Ct. 2636 (1987), the Court held that a state statute authorizing warrantless inspections of automobile junkyards satisfied the Fourth Amendment's reasonableness test. *See id.* at 718, 107 S. Ct. at 2652. In *Donovan v. Dewey*, 452 U.S. 594, 101 S. Ct. 2534 (1981), the Court held that a federal statute authorizing warrantless inspections of underground mines satisfied the Fourth Amendment's reasonableness test. *Id.* at 606, 101 S. Ct. at 2542. And in *United States v. Biswell*, 406 U.S. 311, 92 S. Ct. 1593 (1972), the Court held that a federal statute authorizing warrantless inspections of firearms

dealers satisfied the Fourth Amendment's reasonableness test. *Id.* at 317, 92 S. Ct. at 1597. This body of caselaw suggests that the unconstitutional-conditions doctrine does not invalidate state laws that authorize warrantless searches as a reasonable means of exercising control over a highly regulated activity.[5] The caselaw is relevant because, in Minnesota, operating a motor vehicle "is in the nature of a license or privilege," which "depends upon compliance with conditions prescribed by law." *Anderson v. State, Comm'r of Highways*, 267 Minn. 308, 317, 126 N.W.2d 778, 784 (1964).

Therefore, we conclude that the state's strong interest in ensuring the safety of its roads and highways outweighs a driver's diminished privacy interests in avoiding a search following an arrest for DWI. Thus, if we assume that the implied-consent statute authorizes a search of a driver's blood, breath, or urine, such a search would not violate the Fourth Amendment.

---

[5]The Court has, however, invalidated some warrantless searches authorized by regulatory schemes. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S. Ct. 1816 (1978) (routine OSHA inspection of premises of electrical- and plumbing-installation business); *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 87 S. Ct. 1727 (1967) (request to search portion of apartment building); *See v. City of Seattle*, 387 U.S. 541, 87 S. Ct. 1737 (1967) (request to conduct routine inspection of commercial warehouse). In those cases, however, the searches were conducted pursuant to government regulatory schemes that were not sufficiently pervasive, considering, among other things, the history of that type of regulation. *See Donovan*, 452 U.S. at 605-06, 101 S. Ct. at 2541-42. In Minnesota, driving a motor vehicle has required a license since 1939. *See* 1939 Minn. Laws ch. 401, § 2, at 782 (codified at Mason's Minn. Stat. § 2720-143 (Supp. 1940)). At that time, a person was ineligible to possess a driver's license if he or she was "an habitual drunkard." *See* 1939 Minn. Laws ch. 401, § 4(4), at 783 (codified at Mason's Minn. Stat. § 2720-144(a)(4) (Supp. 1940)).

**D.**

Fourth, even if (a) the unconstitutional-conditions doctrine were to apply; (b) the implied-consent statute were to authorize a search; and (c) a search of a driver's blood, breath, or urine pursuant to the implied-consent statute would violate the Fourth Amendment, we nonetheless would conclude that Stevens's unconstitutional-conditions argument fails because she would not be able to show that the implied-consent statute is sufficiently coercive.

As the supreme court noted in *Netland*, the unconstitutional-conditions doctrine is concerned with coercion and its tendency to deter individuals from asserting constitutional rights. *See* 762 N.W.2d at 211 (citing Richard A. Epstein, *Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L. Rev. 4, 6-7 (1988)). In *Netland*, the supreme court did not attempt to provide a comprehensive statement of the unconstitutional-conditions doctrine. *See id.* at 211-12. For that reason, the supreme court did not determine whether proof of coercion is an essential element of a claim under the unconstitutional-conditions doctrine or, if so, what type or degree of coercion is necessary. *See id.* It appears that the United States Supreme Court "has never developed a coherent rationale for determining when [the availability of choices] rise[s] to the level of 'coercion.'" Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1415, 1428 (1989). Furthermore, because there are no clear rules for applying the unconstitutional-conditions doctrine, it has been suggested that coercion "begins rather than ends the inquiry." *Id.* at 1456. Despite the lack of clarity, we interpret the applicable caselaw concerning the unconstitutional-conditions doctrine to require a

showing that the implied-consent statute coerces a driver into waiving a Fourth Amendment right.

The supreme court stated in *Brooks* that "the choice to submit or refuse to take a chemical test 'will not be an easy or pleasant one for a suspect to make.'" 838 N.W.2d at 571 (quoting *Neville*, 459 U.S. at 564, 103 S. Ct. at 922). Nonetheless, the supreme court stated that "a driver's decision to agree to take a test is not coerced simply because Minnesota has attached the penalty of making it a crime to refuse the test." *Id.* at 570. The supreme court considered the potential coercion of the criminal penalties for test refusal, not the potential coercion of the civil consequences of test refusal. *See id.* But the supreme court's reasoning extends to civil consequences because the supreme court stated that the implied-consent statute does "the exact thing Brooks claims it cannot do – condition[] the privilege of driving on agreeing to a warrantless search." *Id.* at 572. Furthermore, there is no apparent reason for this court to presume that the civil consequences of test refusal are more coercive than the criminal penalties for test refusal. Thus, the supreme court's opinion in *Brooks* forecloses Stevens from establishing that the implied-consent statute coerces a driver into surrendering a Fourth Amendment right in a manner that is offensive to the unconstitutional-conditions doctrine.

For all of the reasons stated above, we conclude that Minnesota's implied-consent statute does not violate the unconstitutional-conditions doctrine by authorizing the commissioner of public safety to revoke the driver's license of a person who has been arrested for DWI and has refused to submit to chemical testing.

23

## D E C I S I O N

The evidence in the record supports the district court's finding that Stevens refused to submit to chemical testing. Stevens has not established that the implied-consent statute violates the unconstitutional-conditions doctrine.

**Affirmed.**

**CHUTICH,** Judge (concurring specially).

I agree with the majority's conclusion that sufficient evidence supports the district court's finding that Stevens refused to submit to chemical testing and that her unconstitutional-conditions argument fails. I write separately concerning the unconstitutional-conditions discussion because I would base my rejection of that doctrine solely on the rationale stated in Part D of the majority's opinion. I agree with the majority that the Minnesota Supreme Court's decision in *State v. Brooks,* 838 N.W.2d 563 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014), prevents Stevens from establishing that the implied-consent statute coerced her into surrendering her Fourth Amendment right in a way that offends the unconstitutional-conditions doctrine.